220 P.3d 264

Jan Michael WEINBERG,
Plaintiff–Appellee,

v.

Brenda Irene DICKSON–WEINBERG,
Defendant–Appellant.

No. 27984.

Intermediate Court of Appeals of Hawai'i.

Oct. 14, 2009.

Peter Van Name Esser (Cheryl R. Brawley with him on the briefs), Honolulu, for Defendant–Appellant.

Charles T. Kleintop (Stirling & Kleintop) (Dyan M. Medeiros with him on the brief), Honolulu, for Plaintiff–Appellee.

NAKAMURA, C.J., WATANABE, and FOLEY, JJ.

Opinion of the Court by WATANABE, J.

In this appeal, Defendant–Appellant Brenda Irene Dickson–Weinberg (Wife or Defendant) challenges (1) the divorce decree entered by the Family Court of the First Circuit (family court)[1] on May 18, 2006 (Divorce Decree), which ended her marriage to Plaintiff–Appellee Jan Michael Weinberg (Husband or Plaintiff) and divided their marital estate; and (2) various orders of the family court that led up to or followed the entry of the Divorce Decree.[2]

Wife raises the following points on appeal:

(1) The family court's 86–page "omnibus" findings of fact (FsOF) and conclusions of law (CsOL), which was signed by three judges without any indication of which judge adopted which finding or conclusion, did not comply with Hawai'i Family Court Rules (HFCR) Rule 52 (2000);

(2) The family court erred when it refused to enforce (a) an agreement incident to divorce (AITD) entered into between Husband and Wife (collectively, the parties or the couple) in a prior divorce action that was dismissed, (b) an agreement to designate Wife as a beneficiary of Husband's individual re-tirement accounts (IRAs) (IRA Agreement), and (c) a quitclaim deed conveying the parties' home in Nu'uanu, Hawai'i (Nu'uanu property) to Wife;

(3) The family court denied Wife her due-process rights when it refused to relax pretrial deadlines, denied her requests for a trial continuance, and barred her from introducing experts, exhibits, and documentary evidence because she missed discovery and other deadlines imposed by the family court after her second counsel withdrew from representing her;

(4) The family court did not comply with Hawaii Revised Statutes (HRS) § 580–47 (2006) or partnership principles when it denied Wife credit for Category 1 assets and valued Husband's law practice without considering Husband's earnings or the unliquidated contingency-fee cases pending at the date of the completion of the evidentiary part of trial (DOCOEPOT); and

(5) The family court failed to consider all the factors enumerated in HRS § 580–47(a) and abused its discretion when it denied Wife, who was unemployed throughout the marriage, any alimony.

We conclude that (1) Wife's first point on appeal is without merit; (2) the family court did not err in refusing to enforce the AITD and the quitclaim deed for the Nu'uanu property, but did err in disregarding the IRA Agreement in dividing the property of the parties; (3) the family court abused its discretion when it refused to extend pretrial deadlines and thereafter sanctioned Wife for missing pretrial deadlines by precluding her from introducing evidence that she did not produce by pretrial deadlines; and (4) the family court incorrectly valued Husband's

---

1. The Honorable Darryl Y.C. Choy (Judge Choy) presided over the trial and entered the Divorce Decree. Unless otherwise indicated in this opinion, the Honorable Karen M. Radius (Judge Radius) presided over the pretrial proceedings at issue in this appeal.

2. Wife challenges the following orders: (1) the "Order Denying [Wife's] Motion to Enforce Agreement Incident to Divorce[,]" entered by Judge Radius on November 28, 2005; (2) the "Order Denying Without Hearing [Wife's] Motion for Reconsideration of Oral Order Denying [Wife's] Motion to Continue Trial (Filed February 26, 2006) Issued March 8, 2006[,]" entered by Judge Choy on April 10, 2006; (3) the "Order Denying [Wife's] Motion to Extend Pre–Trial Deadlines[,]" entered by the Honorable Kenneth E. Enright (Judge Enright) on April 7, 2006; (4) the "Order Denying Without Hearing [Wife's] May 31, 2006 Motion for Reconsideration of Divorce Decree Filed May 18, 2006 and for New Trial[,]" entered by Judge Choy on July 17, 2006; and (5) the FsOF/CsOL filed on August 16, 2006 and signed by Judges Radius, Enright, and Choy.

law practice. Our disposition of this appeal renders it unnecessary to address Wife's remaining points on appeal.

## BACKGROUND

Husband and Wife were married on December 25, 1997 in Beverly Hills, California. It was the second marriage for both, and the marriage produced no children. Husband is a personal-injury attorney with a solo practice in Honolulu, Hawai'i. Wife is a former actress whose last job on a soap-opera series ended in 1987.

### A. The First Divorce Case

On March 2, 2004, after six years of marriage, Husband filed his first complaint for divorce from Wife in FC–D No. 04–1–0658 (first divorce case). Although Wife filed an Income and Expense Statement and an Asset and Debt Statement in the first divorce case, she did not file an answer, apparently because the parties reconciled. On October 27, 2004, the family court dismissed the first divorce case for lack of prosecution. Before the first divorce case was dismissed, however, the parties negotiated a comprehensive AITD.

The AITD provided that Wife would receive (1) $14,000.00 in temporary alimony for forty-eight consecutive months; (2) health insurance coverage for forty-eight months; (3) an equalization payment of $100,000.00; (4) the parties' Le Parc condominium unit in Los Angeles, California (Los Angeles property), free and clear of all liens; and (5) Husband's 401(k) plan of approximately $130,000.00 as Wife's sole and separate property. The AITD also required Husband to maintain an insurance policy on his life that named Wife as the exclusive primary beneficiary of an unencumbered death benefit of not less than $500,000.00. Additionally, the AITD provided that Husband would receive (1) the Nu'uanu property, subject to existing debts; (2) all of his other retirement plans; and (3) his law practice.

### B. The Second Divorce Case

On December 22, 2004, eight weeks after the first divorce case was dismissed, Husband, rather than reinstituting the first divorce case and now represented by a different lawyer, filed a complaint for divorce in FC–D No. 04–1–3936 (second complaint), the case underlying this appeal (second divorce case). Husband's second complaint alleged that the assets and debts of the parties "should be divided in a just and equitable way" and that Wife was "not entitled to an order that [Husband] pay spousal support (alimony) to [her]."

In her January 13, 2005 answer to the second complaint, Wife averred that she was entitled to spousal support from Husband and that any allegations by Husband "which are based upon a denial of spousal support are barred pursuant to [HRS] § 580–47(a)." Wife also "reserve[d] her right to assert additional affirmative defenses in the event discovery indicate[d] that additional affirmative defenses would be appropriate." Wife's answer, which was signed by the attorney who represented her in the first divorce case (Wife's first counsel), did not allege that the division of the parties' marital estate should be governed by the AITD negotiated during the first divorce case.

## PRETRIAL PROCEEDINGS

### A. Pretrial Events from March to August 2005

From March 16 to August 10, 2005, Wife embarked on extensive discovery for information regarding Husband's assets. There is no indication in the record on appeal that Husband engaged in similar discovery of Wife's assets during the same period.[3] Meanwhile, Husband and Wife commenced mediation on March 30, 2005. The mediation was unsuccessful and concluded sometime in July 2005.

On August 2, 2005, Wife's first counsel withdrew and another attorney (second counsel) was substituted as Wife's counsel.

---

**3.** The record on appeal indicates that Husband's first discovery request was filed on August 22, 2005, and it was not until the beginning of January 2006 that Husband began actively pursuing discovery of Wife's financial assets.

On August 4, 2005, Husband filed a form motion to set the second divorce case for trial (motion to set), pursuant to HFCR Rule 94(a) (2000), which requires such a motion to be filed no later than nine months from the filing of the complaint. The motion was scheduled for a hearing on October 13, 2005, at 9 a.m.

### B. *Husband's Pre–Divorce–Decree Motion for Immediate Sale of Properties*

On August 8, 2005, Husband filed a pre-divorce-decree motion for immediate sale of the Nu'uanu and Los Angeles properties. Husband, among other things, alleged that (1) he could no longer afford to pay the $12,313.89 in monthly carrying costs for the two properties; (2) "it is very likely that both real properties will be sold at the end of the case anyway" since Wife does not have the ability to buy out his interest in either property and he was not interested in buying out her interest in either property; and (3) it was a good time to sell these properties because the Honolulu and Los Angeles real estate markets were "hot." Husband also requested that the family court give him sole authority to sell both properties and that he be granted exclusive use and occupancy of the Nu'uanu property and Wife be granted exclusive use and occupancy of the Los Angeles property pending the sales.

On August 26, 2005, Wife filed an affidavit in response to Husband's motion for immediate sale and stated that she intended to enforce the AITD. Attached to the affidavit was a copy of the AITD, which was signed by Wife before a notary public on April 19, 2004 and included what purports to be Husband's signature. Wife urged the court not to order the sale of the two properties until the AITD's enforceability was determined.

Husband's motion for immediate sale was heard by the family court on August 31, 2005, at 1:30 p.m. At 11:05 a.m. that same day, Husband filed a memorandum in response to Wife's August 26, 2005 affidavit, arguing that the AITD was not valid and enforceable and claiming that he had "no recollection of ever signing and returning [the AITD] to [Wife's] attorney." Husband further stated that even if he did sign the AITD, this should not prohibit the sale of the Nu'uanu property, which, under the AITD, was to be awarded to him.

At the August 31, 2005 hearing, Husband agreed that the Los Angeles property should not be sold until the validity and enforceability of the AITD was determined. However, Husband urged the family court to grant his request to sell the Nu'uanu property. Husband maintained that since the AITD awarded him that property, the validity and enforceability of the AITD was irrelevant to his request. At the close of the hearing, the family court orally ordered the Nu'uanu property to be listed for sale. The family court allowed Wife to continue to live at the Nu'uanu property "until October 1st" and allowed Husband to have exclusive use and occupancy of the property thereafter until it was sold. The family court's oral order was ultimately memorialized in a written order filed on November 4, 2005.

On September 12, 2005, Wife filed a motion for reconsideration of the family court's August 31, 2005 oral decision. In the alternative, Wife requested that the decision requiring her to vacate the Nu'uanu property be suspended, pending a hearing on the enforceability of the AITD. This motion was denied by the family court without a hearing, pursuant to an order filed on October 7, 2005.

### C. *Wife's Motion to Enforce the AITD*

On September 19, 2005, Wife filed a motion to enforce the AITD and require Husband to pay the attorney's fees and costs incurred by Wife to bring the motion. Attached to Wife's affidavit was a letter from Husband to Wife dated March 17, 2004, which stated, in relevant part:

Thank you for signing the enclosed Quitclaim Deed [for the Nu'uanu property]. The Quitclaim Deed is conditioned upon my agreement to similarly quitclaim the [Los Angeles] property to you at the end of the month when the mortgage with Washington Mutual of $495,238.89, as shown in the attached statement, is paid in full.

Based on our discussions, we should also have completed an [AITD [4]] by the end of the month. If not, both properties will remain owned as tenants by the entirety and each party will do what is necessary to effectuate that.

(Footnote added.)

In an October 18, 2005 memorandum opposing Wife's motion, Husband vehemently denied signing the "proposed AITD" but also argued that if the "proposed AITD" were signed by both parties, it was either abandoned or unconscionable and, therefore, unenforceable. Attached to Husband's memorandum was a report by Reed Hayes (Hayes), a handwriting-and-document examiner, in which Hayes opined that the AITD was not signed by Husband. Hayes also reported that he was unable to conclusively identify or eliminate Wife as the author of Husband's signature on the AITD.

On October 24 and 28, 2005, the parties litigated the issues surrounding the AITD. Husband and Wife, as well as one handwriting expert for each, testified. At a November 2, 2005 hearing, the family court orally denied Wife's motion to enforce the AITD. On November 28, 2005, the family court entered a written order memorializing its oral decision. The family court determined that the parties had entered into an AITD in the first divorce case but had, by their actions and non-actions, abandoned the AITD. Husband has not appealed the family court's finding that he and Wife entered into an AITD in the first divorce case.

D. *Wife's Motions for Pre–Decree Relief*

1.

On September 29, 2005, Wife filed a motion and affidavit for pre-decree relief (first motion for pre-decree relief), requesting, among other things, that Husband (1) be restrained from wasting, transferring, or otherwise disposing of any real or personal property, except as reasonable and necessary for ex-

penses incurred during the ordinary course of business and for his usual living expenses; (2) continue to pay the mortgages, taxes, insurance, utilities and other expenses related to the Nu'uanu and Los Angeles properties; (3) continue to pay insurance and various living and other expenses for Wife; (4) pay Wife $15,000.00 in monthly temporary alimony; (5) pay off Wife's credit-card debts; and (6) advance Wife $60,000.00 [5] for attorney's fees and costs. Wife also requested that she have exclusive occupancy of the Nu'uanu property pending its eventual sale.

Husband filed a memorandum in opposition to Wife's first motion for pre-decree relief on October 20, 2005. Husband argued that (1) he should not have to pay temporary alimony to support Wife's excessive spending; (2) he was already paying for Wife's housing, transportation, insurance premiums, cell-phone bills, and other costs; (3) Wife had not demonstrated a need for him to advance $60,000.00 for her attorney's fees and costs; and (4) Wife did not need to spend $10,000.00 to retain an expert to value his law practice and for real-estate appraisers because *"Antolik v. Harvey* controls here and the only value to Husband's practice will be its 'hard assets'."

At a November 4, 2005 hearing, the parties testified extensively about their financial status and submitted numerous exhibits into evidence. At the end of the hearing, the family court announced its oral ruling, which was memorialized in a written order filed on December 12, 2005 that stated, in relevant part, as follows:

IT IS HEREBY ORDERED as follows:

1. *Temporary Spousal Support.* Plaintiff shall pay Defendant the sum of *$6,000.00* a month as and for temporary spousal support, commencing the month of November, 2005 and continuing until further order of the Court. The first payment shall be made immediately and pay-

---

4. The letter actually used the term "AICD," an acronym for "agreement in contemplation of divorce." For the sake of consistency in this opinion, the agreement will be referred to as "AITD."

5. Wife indicated that her attorney anticipated that Wife would spend $30,000.00 for legal fees, $15,000.00 to conduct discovery, $10,000.00 to retain an expert to evaluate Husband's business and real estate appraisers, and $5,000.00 for mediation expenses.

ments thereafter shall be payable on the fourth (4th) day of each month.

2. *Advance for Attorney's Fees.* Plaintiff shall advance the sum of *$40,000.00* to Defendant's [second counsel] by December 4, 2005.

3. *Payment of Property–Related Expenses.* Plaintiff shall timely pay the monthly mortgage payments and utility expenses for the [Nuʻuanu property] and the [Los Angeles property]. Plaintiff shall also timely pay the real property insurance premiums and real property tax payments for these properties. Plaintiff shall also timely pay any maintenance fees and assessments (special or otherwise) for these properties.

4. *Payment of Defendant's Health Insurance and Car Insurance Premiums.* Plaintiff shall continue to pay the premiums associated with Defendant's health insurance coverage and car insurance coverage.

5. *Defendant's Remaining Requests.* All of Defendant's other requests in her [first motion for pre-decree relief] are hereby denied.

### 2.

On November 15, 2005, Wife filed a motion for reconsideration of the family court's November 4, 2005 oral ruling. Wife asked the family court to grant her request for moving costs of $15,000.00 or suspend its decision that Wife vacate the Nuʻuanu property until the family court rendered a decision as to payment of the moving costs. Wife also asked the family court to (1) reconsider its award to her of $40,000.00 in attorney's fees and costs; (2) increase the amount of the award to what she had requested ($60,000.00); and (3) advance the time period within which Husband was ordered to pay the funds to counsel from thirty days to ten days. Finally, Wife asked that the family court reconsider the amount awarded for temporary alimony and increase it to the amount prayed for in her moving papers. Wife noted in an accompanying affidavit that her current legal expenses and costs are such that the $40,000.00 in attorney's fees and costs awarded will be spoken for "due to the

unanticipated and extraordinary fees and costs incurred in the hearings to enforce the [AITD] and for temporary support for [Wife]." Wife pointed out that Husband had sufficient stock accounts to provide an advance of $60,000.00 to Wife for her attorney's fees and costs.

The family court denied Wife's motion without a hearing pursuant to an order filed on November 25, 2005.

### 3.

On November 17, 2005, Wife filed a second motion and affidavit for pre-decree relief (second motion for pre-decree relief) in which she requested an order requiring Husband, among other obligations, to (1) pay an additional $40,000.00 toward her legal expenses; (2) assist Wife in vacating the Nuʻuanu property by advancing approximately $15,000.00 for her moving expenses; and (3) allow Wife to remain on the Nuʻuanu property until the end of November 2005 so that Wife could schedule the movers.

Pursuant to an order filed the same day, the family court entered an Order for Pre–Decree Relief which, among other things, scheduled a hearing on the second motion for pre-decree relief on November 23, 2005 and prohibited Husband from "transferring, encumbering, wasting, or otherwise disposing of any of his or her real or personal property, except as necessary, over and above current income, for the ordinary course of business or for usual current living expenses."

On November 21, 2005, the family court received an ex parte motion from Husband, seeking a writ of assistance to remove Wife from the Nuʻuanu property.

At the November 23, 2005 hearing on Wife's second motion for pre-decree relief, Wife asked the family court to allow her to remain on the Nuʻuanu property because the AITD had been ruled unenforceable and, thus, the Nuʻuanu property was subject to division. Wife mentioned that she had "been charged [$] 120,000 in fees[,]" had no personal resources to pay the fees, and had been living off her mother. She estimated that it would cost her $15,000.00 to move back to Los Angeles and expressed concern about

moving all her belongings "across the sea" before the divorce was finalized and she knew where she was going to live. She also mentioned that she needed to examine Husband's books and records in order to prepare for trial. Wife further explained that she was under the care of two doctors, had suffered "a breakdown[,]" and was "too sick to move right now."

At the end of the hearing, the family court orally ruled, in part, that (1) Wife was required to vacate the Nuʻuanu property by November 30, 2005; (2) Wife could leave her clothes and personal items at the Nuʻuanu property or she could take them with her; (3) if Wife chose to take items with her, Husband shall pay $1,000.00 in moving expenses; and (4) paralegals from the law firms representing Husband and Wife should account for all items that Wife left at the Nuʻuanu property.

On December 5, 2005, the family court entered an order granting Husband's ex parte motion and issued a writ of assistance, authorizing removal of Wife and "all other persons with her" from the Nuʻuanu property.

### E. *Pretrial Order No. 1*

On November 28, 2005, following an October 13, 2005 hearing on Husband's motion to set, the family court entered Pretrial Order No. 1, which set trial of the second divorce case for March 13 and 14, 2006, scheduled a settlement conference for February 23, 2006, and imposed the following pretrial deadlines:

| Deadline | Event |
| --- | --- |
| November 30, 2005 | Wife to name her expert witnesses. |
| December 31, 2005 | Husband to name his expert witnesses. |
| 45 days prior to Settlement Conference (January 9, 2006) | Both parties to identify all their witnesses. |
| January 20, 2006 | Both parties to provide their expert reports to opposing party. |
| 21 days prior to Settlement Conference (February 2, 2006) | Both parties to exchange trial exhibits. |
| 14 days prior to Settlement Conference (February 9, 2006) | Husband to file a completed settlement-conference statement and property-division chart. |
| February 15, 2006 | Rebuttal expert reports from both parties to be provided to opposing counsel. |
| 7 days prior to Settlement Conference (February 16, 2006) | Wife to file a completed settlement-conference statement and property-division chart. |

The family court further ordered that "[a]ny agreements to modify deadlines for discovery shall be reduced to writing and submitted to the Court for approval."

### F. *Second Counsel's Motion to Withdraw and for Fees*

On December 8, 2005, second counsel filed a "Motion to Withdraw as Counsel [for Wife] and Request for Attorney's Fees and Costs and Entry of an Attorney's Lien[.]" The motion requested that the family court (1) determine that Wife was indebted to second counsel for attorney's fees and costs totaling $56,334.72; (2) enter judgment against Wife for that amount; (3) direct that the $40,000.00 the family court had ordered Husband to pay as an advance for Wife's attorney's fees and costs be deposited and paid towards second counsel's fees; and (4) enter a lien against Wife's share and interest in the proceeds from the sale of the Nuʻuanu property for the remaining outstanding balance of second counsel's fees and costs.

On December 13, 2005, second counsel filed a motion to enforce the family court's November 4, 2005 oral ruling that Husband advance $40,000.00 in attorney's fees within thirty days of the hearing (i.e., by December 5, 2005) and order Husband to pay the attorney's fees and costs incurred by second counsel in preparing, filing, and presenting his motion.

On December 14, 2005, the family court held a hearing on (1) the issues raised by Wife in her second motion for pre-decree relief that had not previously been decided;

(2) second counsel's motion to withdraw; and (3) Wife's motion to enforce the family court's prior order that Husband advance Wife $40,000.00 for her attorney's fees.

Husband admitted at the hearing that he had not paid the $40,000.00 for Wife's attorney's fees and costs, as previously ordered by the family court, but averred that he would be able to pay the amount "certainly no later than the end of January." Husband expressed concern, however, about paying the $40,000.00 before the fee dispute between Wife and second counsel was resolved.

Wife claimed that the amount of second counsel's fees far exceeded what she had agreed to pay and attributed the high amount to the "eight-hour" trial regarding Husband's claim that his signature on the AITD was "forged." Wife also stated that she was extremely upset that despite the family court's prior order, Husband had removed all her clothes from the Nu'uanu property and placed them in storage. Wife claimed that she had difficulty gaining access to her clothes in storage because they were in boxes that had not been inventoried and labeled. As a result, she was forced to buy clothes to appear in court.

On December 20, 2005, the family court entered three orders that stemmed from the December 14, 2005 hearing.

The first order required Husband "to deposit the sum of $40,000 with the clerk of the [family] court no later [than] close of business, Wednesday, December 21, 2005," but provided that "distribution of the $40,000 is subject to further order of the court, a hearing on which is presently set for either Jan[uary] 9 or 10, 2006." Husband paid the deposit into court, as ordered.

The second order permitted second counsel and his law firm to withdraw as counsel for Wife but scheduled a hearing for January 9 or 10, 2006 to determine what fees Wife owed second counsel.

The third order granted that part of Wife's second motion for pre-decree relief that related to Husband's life-insurance policy and denied all other unresolved issues.

On January 10, 2006, Wife appeared pro se at a scheduled hearing to resolve the fee dispute between her and second counsel. The transcripts of the hearing are not contained in the record on appeal,[6] but it appears that the family court took the matter under advisement.

On January 10 and 11, 2006, Wife filed various documents, pro se, in which she objected to second counsel's fees as excessive. Wife stated that

> the $40,000 being held by the Court is needed for the upcoming trial. For the record, as I've previously stated, nothing has been done yet to prepare for trial; no subpoenas of books or records, no depositions, no complete assessment of [Husband's] business or the assets in question, etc. For this reason, I'm going to need every bit of the $40,000 in contention while I work to secure the remaining amount from my husband to cover the full estimated cost of a trial.

On April 25, 2006, the family court entered a written order that (1) reduced second counsel's requested fees by $2,431.00, plus 4.16 percent excise taxes; (2) ordered Wife to pay second counsel $44,803.52 in attorney's fees, which the family court "entered as a charging lien"; (3) released "$10,000.00 held in this case to [second counsel]"; and (4) directed that the remaining $34,803.52 owed to second counsel "shall be a charging lien."

### G. Naming of Witnesses and Submission of Pretrial Statements

On November 30, 2005, Wife filed a list of prospective witnesses whom she intended to call to testify at trial. Among the witnesses listed were (1) "Gary Kuba, CPA"; (2) Norma Paet, RN, MS; (3) the attorneys who had represented Wife in the first divorce case; (4) various Honolulu attorneys who apparently had referred personal-injury cases to Husband and shared in the recovery of fees earned by Husband for those cases; (5) two entertainers; (6) all witnesses listed by Husband; and (7) rebuttal witnesses, as necessary.

---

**6.** It appears from the record that the family court orally ordered that no transcript of the January 10, 2005 hearing could be provided to any individual without a written court order.

**410**

On December 30, 2005, Husband filed a list with the family court, naming three expert witnesses whom he intended to call at trial: (1) John Candon, CPA, ASA, CBA, CFE (Candon); (2) Patricia Case, Esquire; and (3) Ira Zunin, M.D. (Dr. Zunin). On January 9, 2006, Husband filed with the family court the list of lay witnesses he intended to call at trial.

On February 9, 2006, Husband filed his settlement-conference statement.

On February 17, 2006, Wife, filed her settlement-conference statement, which was prepared by Madalyn Purcell, Esquire (Purcell or third counsel), who made a special appearance in the case. Purcell noted at the outset of the settlement-conference statement that she "has a major scheduling conflict that prevents her from serving as [Wife's] trial counsel and meeting [Wife's] pre-trial deadlines." Wife's settlement-conference statement explained that

> [Wife] believes that the court has already given her a continuance of trial dates and pre-trial deadlines due to the fact that her previous attorney, [second counsel], is no longer her attorney. However, court records and opposing counsel indicate that the present trial date has not been changed. On behalf of [Wife], [Purcell] has requested a Status Conference with [Judge Radius] to discuss [Wife's] situation and the trial dates. We are currently waiting for a response from the court regarding our request for a Status Conference. If the trial and pre-trial dates cannot be rescheduled, then [Purcell] will have to immediately withdraw from further representation of [Wife].
>
> Additionally, [Wife] is waiting to see whether the court will release to her all or part of the $40,000 of attorneys' fees advanced by [Husband] and presently claimed by [second counsel]. [Wife] will need these funds to pay her current or future counsel for trial preparation. [Wife's] current counsel has not had the opportunity to review all of the voluminous discovery files, and therefore has not had sufficient time to prepare [Wife's] Property Division Chart. However, [Wife] believes that [Husband] has significantly un-

dervalued the net worth of the marital estate by failing to include the value of the improper transfers of marital money made to his friends, and by significantly under valuing the [Nu'uanu property].

Wife's settlement-conference statement further stated:

> Curiously, [Husband] made substantial transfers of marital funds just prior to filing this second divorce action and during the current divorce proceeding. He transferred $84,374.46 on December 20, 2004, and $203,123.70 on March 5, 2004 to John R. Dwyer, Jr. [(Dwyer).] In response to subpoena, [Dwyer] has not produced any work files to show what his law firm did to earn these fees. [Husband] transferred $664,453.30 to Roeca Louie and Hiraoka on January 25, 2005. In response to subpoena, the Roeca law firm [ (Roeca) ] has not produced any work files to show what work they performed to earn these fees. [Husband] also paid his former employee Mark Haugen [ (Haugen) ] a check for $200,000 during the pertinent period. In response to subpoena, [Haugen] has not produced any work files to show what he did to earn this money. At best, these are improper transfers in clear violation of the Code of Professional Responsibility, and, at worst, they are fraudulent transfers made to deplete the marital estate.
>
> If the case cannot be expeditiously settled, then [Wife] will need an advance of funds to pay her attorneys' fees and costs. In addition, [Wife] will need further and immediate pre-decree relief. [Husband] has changed the beneficiary on his annuities, 401Ks, IRAs, and insurance policies, so that [Wife] is no longer the beneficiary. These assets are part of the marital estate. [Husband] made an improper transfer of marital property rights when he made beneficiary changes. If [Husband] should die before the divorce is complete, there would be a protracted and expensive legal battle. [Wife] would bear the burdens and problems with no cash flow. [Husband] *created* this problem and he should be made to *pay for correcting it.* Unless this case can be settled *immediately,* [Husband] must change the beneficiary designations on all

of these marital assets back to [Wife] until the completion of the divorce.

As to expert witnesses, Wife's settlement-conference statement stated that

it appears that [Wife's] former counsel concentrated on the action to enforce the prior [AITD] and did not retain expert witnesses for trial. To be appropriately prepared for trial, [Wife] needs to retain: a business evaluator; a vocational specialist; and a psychologist. She does not have presently have [sic] funds to retain these experts.

Additionally, Wife's settlement-conference statement mentioned that (1) Wife's present counsel needed to review Wife's witness list to determine its accuracy; (2) Wife needed to obtain Husband's 1099s and income tax returns for 2005, as well as updated financial information about Husband's current cases; and (3) Wife needed to depose Dwyer, Roeca, Haugen, and Husband's business evaluator.

Attached to Wife's settlement-conference statement was an offer of judgment made to Husband pursuant to HFCR Rule 68 (2000), which was to expire, if not accepted, within ten days.

H. *Wife's Motions to Cancel Trial and Continue Pretrial Deadlines and Trial; Wife's Efforts to Obtain Counsel; and Wife's Motion to Recuse a Judge*

1.

On January 11, 2006, Wife, pro se, filed a request to cancel trial in which she stated:

For the second time in this matter with [Husband], I am without the necessary funds or preparation to adequately proceed with the trial at this time. The $40,000 being held by the Court, which I am presently unable to make use of, is a necessary component for the financing of my case. In addition to having my belongings locked away in storage by [Husband] and his attorney, and having been deprived of my home and office, and having been placed in a position where I barely have the resources (financial and otherwise) to get through each day, there is simply no way that a trial on this matter can reasonable [sic] proceed any time soon.

[Husband] and his attorney are knowingly undermining my access to necessary resources, while trying to speed up the trial at a time when they are fully aware that I am without representation. It's been estimated that my new attorney's services for such a trial, once that attorney has been retained, will cost $75,000. To this end, I'm going to need every bit of the $40K while I work to secure the remaining amount from [Husband] to cover the total estimated cost.

To date, as the Court is aware, there has been no substitution of attorneys—so I would like all subpoenas and pre-trial activity stopped until a new trial can be scheduled, preferably in California.

No hearing was ever scheduled or held on this motion.

2.

On February 24, 2006, Wife, through Purcell, filed a motion captioned "Motion to Continue Trial" that sought (1) "[a] continuance of trial, which is presently scheduled for March 13, 2006, for at least five months to allow her to complete discovery, retain experts and prepare for trial"; and (2) "[a] continuance of all pre-trial deadlines, including Calendar call which is presently scheduled for March 2, 2006." A hearing on the motion was scheduled for March 8, 2006 before Judge Radius.

In a declaration attached to the motion, Purcell stated that (1) she was retained by Wife to assist Wife in obtaining a continuance of this action; (2) Wife and second counsel dissolved their relationship in December 2005, but, due to the holidays and other considerations, Wife had some difficulty immediately locating new counsel to represent her; (3) Purcell would be happy to represent Wife at trial but, due to Purcell's schedule, could not represent Wife unless the current trial dates and pretrial dates were continued; (4) Purcell is in possession of Wife's voluminous files for this case, is in the process of reviewing them, and has ascertained from her preliminary review of the files that Wife is not prepared to go to trial in March 2006; (5) Wife needs to complete discovery of Husband's business and person-

al finances, bring further pretrial motions to request an additional advance for attorney's fees and living expenses, retain expert witnesses to present her case at trial, and take Husband's deposition; (6) Purcell needs time to review the voluminous discovery files to prepare for Husband's deposition; (7) it will take two to three weeks after Husband's deposition for transcripts to be completed; (8) Wife's business evaluator cannot begin work until the depositions are completed and Wife obtains funds to retain a business evaluator; and (9) Wife will need at least five additional months to complete discovery and prepare for trial.

It appears from the record that at the calendar call held on March 2, 2006, the family court[7] announced that Judge Choy would be the assigned trial judge for this case, but, due to Judge Choy's schedule,[8] the trial was being moved to April 10 and 11, 2006.

On March 6, 2006, the family court issued an order requiring second counsel and Wife to submit written briefs by March 17, 2006 as to whether the family court had "jurisdiction and/or legal authority to entertain and decide upon [second counsel's] claims against his former client in the above-entitled divorce case as opposed to a separate distinct lawsuit between [second counsel] and [Wife] in District or Circiut [sic] Court."

On March 8, 2006, the family court, Judge Choy presiding, conducted a hearing on Wife's February 24, 2006 motion to continue trial and pretrial deadlines. Judge Choy mentioned that he was assigned to hear the motion because it affected his schedule. Purcell reiterated the history of this case and explained what needed to be done by Wife to prepare for trial. Purcell argued that justice would not "be served by rushing this case to trial if [Wife] doesn't have the opportunity to get all her evidence, explore what has been done with the marital funds, she's—her opponent is extremely sophisticated, and she needs assistance and time." Husband's attorney argued that the family court had "set very, very strict deadlines ... [m]ore dead-

lines than normally would be set" and it would not be fair or reasonable for Wife to gain an advantage in the case by a further continuance of trial. However, he promised to cooperate with Wife's counsel during the next month if she wanted to take Husband's deposition. He also promised to make available Husband's updated financial information, including his 2005 income tax returns.

At the end of the hearing, the family court orally ruled as follows:

The court has heard the arguments of counsel. I've read both the motion to continue and the memorandum in opposition thereto. The court does note this is a weird case.

It's well over a year old. It's even in a position to be dismissed when this matter proceeds to trial. Trial has already been moved, my understanding from next week Monday to the Monday of April the 10th. This court is compelled and I will order that this motion be denied.

It has to be heard. It has be [sic] heard quickly. The only thing I can say is that the 10th is not a good day. However, I've been informed by the Chief Justice that I cannot work that day. Between terms there's a mandatory day off, and I've been (unintelligible, voice drops).

. . . .

... This case—will be held on the 11th, will commence 11th with the calling of first witness, and we'll conclude on the 12th.

(Formatting altered.) The family court, in denying Wife's motion, did not specifically address the part of Wife's motion that requested a continuance of pretrial deadlines.

Immediately following the family court's oral ruling, Purcell orally moved to withdraw, stating that she could not represent Wife without a continuance of trial. The family court instructed Purcell that her motion had to be made in writing. On March 16, 2006, Wife filed an affidavit in which she consented to Purcell's withdrawal.

---

7. The Honorable R. Mark Browning presided.

8. Judge Choy, a retired family court judge, apparently was assigned to sit as a per diem family court judge on just a few days each month.

On March 20, 2006, Wife, through Mary L. Lucasse, Esquire (Lucasse) by special appearance, attempted to file a "Motion for Reconsideration of [the March 8, 2006] Oral Order Denying [Wife's] Motion to Continue Trial (Filed February 24, 2006)" (Motion for Reconsideration of Oral Order) and other documents in support of the motion. The motion, brought pursuant to HFCR Rules 59(e) (2000) and 60(b) (2000), stated:

> The grounds for this request [are] founded in equity, fairness and justice. It would be an utter miscarriage of justice to force [Wife] to proceed to trial without an attorney who is willing and able to take the case to trial, without experts to provide expert testimony regarding a fair division of the complicated multi-million dollar marital property, without experts to testimony [sic] as to her need for ongoing spousal support, without the ability to prepare for trial, and at a time when [Wife] is under considerable stress (as testified to by her treating medical care providers) which impedes her ability to prepare for and participate in the trial.

(Footnote omitted.) Although the motion was file-stamped as "received" by the family court on March 20, 2006, it was returned to Wife's counsel, unfiled, on or about April 3, 2006, with a handwritten notation on a post-it note that Husband's counsel "will prepare order denying this."

On April 4, 2006, the family court [9] entered a written order denying Wife's motion to continue trial. The order expressly stated that "[t]he trial in this matter will be held on April 11, 2006 and April 12, 2006."

On April 10, 2006, the family court entered an order denying, without a hearing, Wife's Motion for Reconsideration of Oral Order. Subsequently, the family court apparently granted Wife's ex parte motion, received by the family court on May 31, 2006, petitioning the family court to order that Wife's Motion for Reconsideration of Oral Order be filed in the record or, alternatively, that the clerk of the court be directed to file the motion.

3.

On March 23, 2006, Wife filed a motion for pre-decree relief, seeking an order requiring Husband to advance an additional amount of money for attorney's fees and costs, sufficient to allow her to pay an attorney to prepare for and litigate the case through trial. In a memorandum in support of the motion, Wife noted that (1) the divorce proceedings have been "hotly contested and acrimonious"; (2) Husband had already incurred $102,860.30 in attorney's fees and costs to litigate the case; (3) although the family court had ordered Husband to advance $40,000.00 for Wife's attorney's fees and costs, second counsel's motion that the $40,000.00 be paid to him was still under advisement; (4) second counsel had not retained or paid for expert witnesses for Wife, taken Husband's deposition regarding the value of Husband's law practice, or prepared Wife's exhibits for trial; (5) Wife was without counsel from the date of second counsel's withdrawal in December until Purcell first appeared for Wife on February 17, 2006; (6) Purcell orally moved to withdraw on March 8, 2006, after the family court denied Wife's motion to continue trial, and Purcell filed a written motion for leave to withdraw and an ex parte motion to advance the time of the hearing on her motion to withdraw on March 15, 2006, but her motions had not been scheduled for hearing; (7) whether Purcell or another attorney takes Wife's case to trial, presently scheduled for April 10 and 11, 2006, Wife needs funds to pay for trial preparation, including the deposition of Husband, an expert certified public accountant to analyze the value of Husband's law practice, and the preparation of Wife's exhibits and position statement; (8) Wife has incurred unpaid legal fees and costs with Purcell's law firm of $11,000.00 to $12,000.00, and Purcell cannot afford to continue to finance Wife's litigation; (9) Lucasse is willing to be retained to take Wife's case, but her law firm requires a retainer equal to the projected cost of trial; and (10) Wife's temporary spousal support is substantially consumed by Wife's interest payments on her credit-card debt, and Wife

---

9. Judge Choy entered the order.

has no personal funds other than those borrowed from her mother.

4.

On March 23, 2006, Purcell filed a "Second Ex Parte Motion to Advance Time for Hearing on Counsel for [Wife's] Motion for Leave to Withdraw and for Judgment for Attorney's Fees and Costs and Certificate of Service." The motion stated, in relevant part:

This is an urgent matter because trial is scheduled for April 10 and 11, 2006, less than 3 weeks away, and Counsel for [Wife] who is a sole practitioner first appeared in this matter at the settlement conference on February 23, 2006, less than 1 month ago, with the understanding that a continuance of trial could be obtained. Counsel for [Wife] is unable to prepare for [Wife's] trial due to time conflicts and has been placed under extraordinary economic burdens of hiring substitute counsel to prepare for [Wife's] trial. By the time Judge Choy returns on April 3, 2006, [10] trial will be less than 1 week away, and by the time Judge Choy could set this matter for hearing, trial will be *less than* one week away, and most of the trial preparation expense will have been incurred. [Wife] has submitted her Affidavit in Support to Counsel for [Wife's] Motion for Leave to Withdraw that was filed on March 16, 2006.

(Footnote added.)

Following a hearing held on March 24, 2006, the family court entered an order granting Purcell's motion to withdraw, allowing Purcell to (1) submit an affidavit or declaration regarding her attorney's fees and costs,[11] (2) serve it on Wife by certified mail and facsimile, and (3) provide a record of service to the court. The family court also ordered Wife to accept certified mail and required Wife to appear at trial personally if she wished to present testimony.

10. In an attached declaration, Purcell indicated that the "moving papers related to her motion to withdraw were submitted to court on March 15, 2006, but could not be assigned a hearing date because they were sent to [Judge Choy] and Judge Choy's staff states that he is out of town until April 3, 2006."

By an order filed on March 24, 2006, the family court ordered that $30,000.00 of the $40,000.00 presently held by the chief clerk of the family court as an advance for Wife's attorney's fees and costs be released to "the attorney retained by [Wife] for deposit into his or her client trust account after that attorney files an Appearance of Counsel as [Wife's] attorney in this case." The order also stated: "Nothing in this order shall be construed to indicate that the court will continue trial or extend deadlines."

On April 3, 2006, Husband filed a memorandum in opposition to Wife's motion to extend pretrial deadlines, which motion Husband's attorneys had received on March 20, 2006 but for which no hearing had yet been set.

On April 3, 2006, Husband filed a notice of taking an oral deposition of Dr. Zunin on Wednesday, April 5, 2006, at 12 p.m. Hawai'i time, and 3 p.m. West Coast time, in order to perpetuate the testimony of Dr. Zunin, who "has become unavailable to testify at trial due to the rescheduling of the trial dates to April 11, 2006 and April 12, 2006."

5.

On April 4, 2006, Wife filed another motion to extend pretrial deadlines to allow her time to retain experts, if necessary, submit expert reports and rebuttals, and prepare testimony for use in trial of the contested matters. Wife reiterated the history of this case and argued that "[t]he instant divorce case involves a complex marital estate, comprised of several real properties, a business, and potentially millions of dollars in assets" and "[i]t would not be in the interests of equity to force [Wife] to proceed to trial without evaluating [Husband's] expert reports, nor to submit expert reports of her own rebutting [Husband's] contentions."

11. In her affidavit filed on April 4, 2006, Purcell requested a total of $15,553.58 for attorney's fees and costs incurred for Wife that had not yet been paid.

6.

Lucasse specially appeared for Wife at a hearing held on April 7, 2006 on Wife's motion to extend pretrial deadlines. At the outset of the hearing, Judge Choy, who was presiding, disclosed that his son "is the most junior associate" in the same firm as Lucasse. Husband had "no problem" with this situation. Lucasse stated, however, that Wife did not waive the conflict and was very concerned about the fact that Judge Choy's son worked for Lucasse's firm. Lucasse then orally moved to recuse Judge Choy from the case, noting that Wife was concerned about Judge Choy's son overhearing discussions about the case. Husband argued that Wife needed to file a written motion to recuse Judge Choy. Additionally, Husband expressed concern that Lucasse was entering a special appearance and may not even be Wife's attorney at trial. Ultimately, Judge Choy transferred the handling of the motion to Judge Enright. Judge Choy stated, however, that he would preside over the trial unless a written motion for his recusal for trial was received. Following a recess, the hearing continued before Judge Enright.

Lucasse argued that much had happened since Wife's motion to extend pretrial deadlines was filed on March 20, 2006:

On March 24, Judge Radius granted [Wife's third] counsel's motion to withdraw. So as of that date [Wife] has been without counsel.

As I understand it, [Wife] is not well educated. She's not able to represent herself in a complex, multi-million dollar marital property division case.

Another thing that has happened since we filed our motion is that the court ordered the clerk of the court to release $30,000 to the attorney who would take the case to trial, as I understand, and enter an appearance in the case.

As I understand, that money is still available for trial prep and it has not been disbursed to anyone at this time.

Finally, what's changed is the passage of time. When we submitted this motion, or when this motion was submitted, on—on or around March 20, we were still within time

to prepare for trial. That's no longer the case.

As I understand it, trial has been set in this case for next Tuesday and Wednesday. I don't think that there's any attorney in town that would take a case that involves a file cabinet full of financial documents, expert report dates passed without the submission of expert reports, documents requested and not produced, because of problems that defendant has had retaining and working with counsel.

Those are the things that have changed since this motion would be filed. At this point, we still maintain that the extension of the pretrial deadlines and in fact the trial date itself should happen.

And the reason for that is we have a client here who has a grad—grade [sic] inequity when compared with her divorcing husband, who is an attorney himself, who's retained by counsel who has a substantial family law—law firm who is here with an associate today. And on the other side we have [Wife].

We have submitted—or she has submitted to the court Exhibits 4 and 5 to the motion to reconsider, which are letters from her doctor. And I don't know if they were something you had an opportunity to review.

Dr. Steven Kimbel informed the court that [Wife] has an adjustment disorder with anxiety. She's on—on a variety of medication. Right now, as I understand it from his letter, she's not presently taking a particular medication during the day for this because of—for medical reasons.

In addition, her therapist, Gary Augustin, has opined to the court that she's unable to do this by herself. She's not able to prepare for trial. She's just in a state that makes it impossible for her to represent herself, if you will.

[Wife] needs counsel at this time. Without counsel, I think a trial would be a travesty. You have arrayed against her counsel who is obviously well prepared, well positioned with an expert, two expert reports, all lined up against a minimally qualified person who is not an attorney, is not by trade a logical person. She's an

actress by profession. This is not something that she can just step in and do.

Why should she be punished for her counsel's withdrawal?

I'm not here to point fingers. I can't speak for other counsel. But what I can see, from looking at the record, that her [second counsel] withdrew in mid-December. The trial date, pretrial order 1 had been set I think it was sometime in October.

As he withdrew, many important deadlines were just coming due. The deadline to submit documents to the other side was at the end of December. Expert reports were due January 20. He had named an expert, but he had not provided documents to the expert.

So that when [Wife], who was talking to many people and trying to find an attorney to represent her, was able to represent [sic] [Purcell] who the record seems to indicate came in around January 29, not only had several of these pretrial deadlines already past [sic], but she wasn't able to get an attorney, [Purcell], to take on the case for trial.

As we learned from [Purcell's] motion to withdraw, [Purcell] had always been somebody who was going to help [Wife] get a trial continuance, to work on settlement. She attended the settlement conference which was February 23.

But attorney [Purcell] did not do any of the trial prep, nor apparently had she promised to do so. So that I think is probably in large part why she was let out before the trial took place, just two weeks ago now.

Many things have gone undone. The trial was set in October for March. That contemplates about a six month prep for trial. Within about two months, two and a half months, [Wife], who is not an attorney nor prepared to do this, was without counsel to prepare for trial.

That's the position we're really in today. All this stuff, flailing around, looking for counsel, trying to get prepared for trial has not happened.

We're four months really before [Wife] would be prepared for trial. That's too long a delay. And I see counsel shaking his head. We're not asking for four months. But what we are asking for is a fair chance to help [Wife] prepare for trial.

I have been asked to step in as trial counsel. And at the time I was asked, and I still do today, have conflicts with the trial dates. I was not able to accept a case to go to trial, two days, when I can't prepare for it, I can't review the files, financial documents, I don't have an expert.

And that's why when I look at this case with fresh eyes, what I see is the [Wife] who needs—who needs to have this motion granted so that she can be prepared to litigate the case.

Two months in the scheme of things is not a very long time, and that's what we're requesting. That the pretrial deadlines be moved.

I have spoken to Mr. Kuba who tells me that he can prepare for trial still. . . . He's already been named and—and understand that he's trial expert. But to do the work, to prepare for trial, if he has some time to do that.

If this motion is not granted, I think there would be a great inequity done. I'm not saying that [Wife] is without fault. I don't know because I have not been part of the case so far. I'm sure you can always point fingers or—and I'm sure that [Husband] will, at her.

. . . .

And looking forward, we just ask that the court recognize that and with fairness give her the chance to prepare for trial. I think that can be done in two—two months. And that's what I represent to the court should be done.

Judge Enright denied Wife's motion. He stated:

I actually struggled trying to think of a way that would be fair for both sides to extend the deadline because not having everything in place that should be in place for a trial is something nobody likes to see happen, especially the judge.

However, all this information should have been available before the settlement

conference. And really what has gone on in this case has undermined, it appears, the whole process of—that goes into trying to help parties reach agreements. And if they can't reach agreements, to make sure that they'll have a fair trial and to avoid this exact situation. So I don't know exactly what broke down, but something broke down.

But the motion to continue the trial has been ruled on. And it sounds to me like it's been ruled on twice. Thus, if this is a motion to continue the trial, which I'm hearing is its—is what it really is, then I really don't have any ability or legal basis to rule upon it once again. So that oral motion would have to be denied.

And the written motion, as [Husband's] counsel has stated, doesn't really make any sense. Unless you had a report in hand, and then possibly we could squeeze the dates so that the trial could still go on Tuesday.

. . . .

[T]here's really no—no intelligent or reasonable way that I could move any deadlines. It would serve no purpose.

### I. *Motions in Limine and Motion to Recuse*

On April 7, 2006, Husband filed a motion in limine to bar Wife from presenting at trial expert witnesses, expert reports, trial exhibits, evidence which she did not provide in discovery, and claims not raised in her position statement.

On April 10, 2006, the law firm of Burke McPheeters Bordner & Estes entered its appearance as counsel for Wife. Lucasse signed the appearance of counsel.

On April 10, 2006, the family court received Husband's ex parte motion to shorten time for a hearing on Husband's concurrently filed motion in limine for admission of Husband's trial exhibits into evidence without foundational questions. Husband stated that the motion in limine had to be heard before

trial commenced on April 11, 2006, at 8:30 a.m. The family court granted the ex parte motion by an order filed on April 11, 2006, at 8:30 a.m. In his motion in limine, Husband argued, in relevant part:

Paragraph V.F.5 of the November 12, 1997 Family Court Policy Memorandum [12] states as follows:

Following the Calendar Call, and at least 48 hours prior to trial, each counsel shall deliver to the Calendar clerk and opposing counsel, a copy of the opposing party's exhibit list with an indication of which exhibits will be stipulated into evidence. Failure to do so will result in a waiver of objections as to any exhibits not stipulated into evidence.

The deadline for Wife to object to any of Husband's trial exhibits (by submitting to the Calendar clerk and [Husband's attorney] a copy of [Husband's] Exhibit List with an indication of which exhibits will be stipulated into evidence) was 8:30 a.m. on Friday, April 7, 2006. That deadline came and went, and Wife did not object to any of Husband's trial exhibits by submitting a copy of [Husband's] Exhibit List to the Calendar clerk and [Husband's attorney]. Her failure to do this has now resulted in a waiver of objections by her to any of Husband's trial exhibits.

Husband is therefore, asking the Court to admit all of his trial exhibits into evidence without requiring him to ask foundational questions (or otherwise lay a foundation) for those exhibits. Husband is *not* asking the Court to consider any trial exhibits that he doesn't reference in his case at trial. He is simply asking the Court to admit his trial exhibits into evidence without requiring him to ask foundational questions (or otherwise lay a foundation) for those exhibits.

Husband is making this Motion to save the Court's and his time at trial since

---

**12.** The November 12, 1997 Family Court Policy Memorandum is not contained in the record on appeal, and it is not clear to this court who issued the memorandum and how and to whom it was distributed. We are troubled that the

memorandum, which allegedly requires imposition of mandatory sanctions for violation of its terms, was not adopted as a court rule and does not appear to be widely available to members of the bar or the public.

Wife's failure to timely object has resulted in a waiver of objections by her.

(Footnote added.)

Prior to the commencement of trial on April 11, 2006, the family court, Judge Choy presiding, heard arguments on several motions.

Judge Choy denied Wife's request that he recuse himself from the case because his son was an associate with Lucasse's law firm.

As to Husband's motions in limine, Judge Choy informed the parties that the deadlines set by the family court "are pretty much chiseled in concrete." Accordingly, the family court precluded Wife from presenting any evidence that was not provided by her in discovery. The family court also directed the parties to "stay well within the confines of their positions" unless justified by a change in circumstances.

## TRIAL PROCEEDINGS

### A. *Husband's Trial Evidence*

#### 1. *Husband's testimony*

Husband testified that he is sixty years old and that he and Wife have been physically separated since December 30, 2004. He has two children from a prior marriage and is still obligated to support one child, a senior in college, with monthly payments totaling approximately $2,000.00. Husband stated that he has been diagnosed with an irregular heartbeat and, as a result, has attempted to reduce his caseload. He also takes medication for various maladies.

Husband testified that Wife is currently fifty-seven years old, and although she did not work during their marriage, he believes she is capable of finding work again. The family court took judicial notice of Wife's testimony at an August 31, 2005 hearing in this case, in which Wife stated that she could find a job in Hawai'i, New York, and Los Angeles. Husband related that he has been paying Wife $6,000.00 in monthly spousal support since November 2005 and has been paying Wife's car and health insurance, doctor's bills, and all costs associated with their residences.

Under Husband's proposed property distribution, Wife would receive a "little over 1.1 million" which includes (1) half the proceeds from the sale of the Nu'uanu and Los Angeles properties; (2) Wife's portion of a 401(k) plan "which is vested for her in about $140,000"; (3) appreciation "in the IRA, pre-marital IRAs"; (4) Wife's cash on hand; and (5) her two vehicles.

Husband was questioned about the asset-and-debt statement that he had filed as part of his divorce from his first wife in 1996. According to that statement, (1) the value of Husband's law corporation in 1996 was negative $301,796.00; (2) his law corporation earned about $1.7 million in 1996; and (3) he received $85,000.00 from the division of real property and about $477,430.00 from the division of his retirement accounts as part of his first divorce. The statement also indicated that Husband owed a $20,000.00 credit-card debt, $300,000.00 for federal taxes, and $77,000.00 for state taxes.

Husband explained that in 1996, he also owed a $656,528.00 debt to his then-law corporation:

> [O]ver the course of being in practice on my own from 1978 through 1996, there are accounting transactions that are construed as constituting advances or loans. Nobody can ever explain to me what it means. All I know is I pay taxes on everything I've ever earned. I don't have [$] 656,000, and it's a paper transaction representing a[sic] bookkeeping and accounting principles. So it would take a CPA to explain it.... It's a company debt that I—that I owe.

(Formatting altered.) This debt was unpaid at the time he married Wife in 1997.

In addition, Husband stated, he was personally liable for a $335,000.00 Bank of Hawaii loan to finance his law corporation. This debt was later transferred to City Bank and "it may have been approximately $300,000" prior to Husband's marriage to Wife.

Husband testified that in 2005, his net income was between $950,000.00 and $1 million. That year, he paid approximately $250,000.00 to $300,000.00 in federal taxes and $70,000.00 in state taxes, and he also repaid various loan obligations.

Husband related that he currently owed $241,208.00 to his law corporation, which had used a line of credit from Central Pacific Bank to loan him that amount to pay his personal taxes.

### a. The IRA agreement

Husband acknowledged that in 1998 and 1999, he received, for the first time in his life, "a notice of a tax deficiency that was huge." He was working under enormous stress at the time, having picked up the caseload of a retiring attorney, and was also working on several of Wife's pending cases. In 2000, Husband testified, he incurred about $350,000.00 in tax liens, which devastated him. Husband stated that Wife became "hysterical" that tax issues would leave her "unprotected as she had been in her first marriage when her first husband's tax liens resulted in her foreclosure at Le Parc and eviction from Le Parc." Wife wanted a guarantee that she would be reimbursed for money she had spent on renovations to the Nuʻuanu property, which cost between $80,000.00 to $120,000.00, and for her surgeries. Husband testified:

Finally, I said I'll go to [James Starshak (Starshak) [13]] and *I'll get an agreement that will assure you that you're gonna be repaid and—and [Starshak] will draft it.*

Actually, after that, truthfully, I had very little contact with [Starshak] because I was ... busy working. He complained to me that [Wife] was leaving multiple messages. And I said if you have to, you know, just get out something and—and let me give her security so that her—she's not at risk for her money.

He sent an agreement. And as I recall—I didn't look at it—we were driving one night. I had given it to [Wife] ... and she insisted that we go to Kinko's at Queen Street, sign it. . . .

And that was it. And then I paid her back her money. All of it. Whatever she wanted refurbished. Then I put the darn thing out of my mind. In fact, didn't even have it in my mind in this suit until [Hus-

band's counsel] asked me about an agreement and said what—what is it?

(Emphasis and footnote added.)

Pursuant to the IRA Agreement, which was prepared by Starshak, signed by Husband and Wife, and dated July 13, 2000, Husband agreed to designate Wife as the beneficiary on four IRAs maintained by Husband "if Wife survives Husband." The IRA Agreement also provided:

2. Division In Case Of Divorce. *If Husband and Wife divorce, Wife shall be awarded one half of the [four IRAs].* This is a separate agreement between Husband and Wife. All other marital assets will be divided pursuant to the laws of the State of Hawaii. In the event of a divorce any other marital assets will be divided in addition to the [IRAs], as set forth above.

3. Binding Effect On Successor IRAs: Husband agrees to designate Wife as the beneficiary, if she survives Husband, of any individual retirement account that receives a distribution or roll-over from the IRA.

4. Management Of IRA. As long as Husband is not in breach of this Agreement, Husband shall have the right to manage and direct the investments of the IRA or qualified retirement or profit sharing plan or transferee retirement plan that receives a distribution or rollover from the IRA.

. . . .

7. Amendment. No amendment, variation, or extension of the terms of this Agreement shall be valid unless made in writing and signed by Husband and Wife and in no other manner.

. . . .

9. Successors and Assigns. The rights and obligations under this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, heirs, and permitted assigns.

(Emphasis added; stricken typewritten text omitted.) Husband was allowed to explain

---

**13.** The transcripts spell the last name of the attorney as "Starchak." However, based on the official list of licensed attorneys in Hawaiʻi, it appears that the attorney's last name should be spelled "Starshak."

that the IRA Agreement was conditional in that

> [i]f [he] breached [his] promise to make sure that [Wife] was protected from the tax liens and from any monies that she had to spend which she regarded as her own money, that in that event that [he] defaulted on those, she had some security. But [he] never expected this agreement to be used when [he] satisfied [his] promise to make good so that she wasn't exposed and indeed has not been exposed to a dime of anything related to [him] ... or anything related to her own expenditures before [they] separated.

(Formatting altered.) Husband admitted that this condition was not incorporated into the IRA Agreement and that the IRA Agreement had not been subsequently canceled by another written agreement. He also acknowledged initialing a handwritten amendment to the IRA Agreement that the agreement was not governed by Hawai'i property division law.

Husband indicated that he had notified the IRA companies of his naming of Wife as a beneficiary of the four IRAs but had removed her name when the couple separated.

### b. Quitclaim of Nu'uanu property

Husband explained that title to the Nu'uanu property was originally in his name alone because he was "told by mortgage brokers not to put [Wife's] name on any mortgage applications. So [he] applied in [his] name with the understanding that after [he] obtained title [he] would quitclaim ... the interest back to [them] as tenants by the entirety, which [he] did."

Husband acknowledged that at the time of trial, the Nu'uanu property was titled solely in Wife's name, but he claimed that he and Wife both owned the property as tenants by the entirety:

> [W]hen we refinanced the Nu'uanu [property], in 2003, the mortgage broker again said, make the applications in your name only. Don't let [Wife's] name get near the application. [Wife] quitclaimed her interest to me, quitclaimed to me. I made the application.

After the application was made and the [$] 950,000 roughly in ... refinancing was obtained, *I asked my secretary to quitclaim the property back to us. She quitclaimed the property by mistake to [Wife]. I signed it.*

> ... I realized that as I reviewed documentation for this case, and asked an attorney to file what was appropriate in the land court to recognize that that was a mistake. I was—I believe that it's not even legally in [Wife's] name because it was an improper quitclaim. I'm not a real estate attorney and I didn't do it the way you're supposed to. Probably never had.

> Um, but the—it was a mistake that—that it was, uh, in land court as a quitclaim deed back to her. Plain and simple mistake.

>  . . . .

> ... I've been told that it is not legally in her name only. If one were to, um—dig below the surface and—and find out what the legal requirements were for an appropriate quitclaim, *we still own it by the entirety.*

(Emphases added; formatting altered.) Husband stated that he did not intend to gift his interest in the Nu'uanu property to Wife.

### c. Husband's law practice

Husband testified that his law practice increased in value by $54,000.00 during their marriage. Although Husband requested that he be awarded his law practice in its entirety, he acknowledged that Wife is entitled to half of the $54,000.00 increase.

With respect to the value of his law corporation at the time of his marriage to Wife in 1997, Husband testified that he has no independent valuation aside from his expert witness's appraisal, and he did not recall discussing his active cases with the expert.

Husband estimated that in 2006, his law corporation had thus far earned nearly $1.1 million. He received "$30,000 per month in distributions" and after paying various expenses, he "might have a thousand or two left over[.]"

Husband was asked about prior cases during his marriage to Wife for which he had

obtained sizable recoveries for his clients and earned substantial fees. Husband testified, in summary:

- In a 2003 wrongful-death case, a client recovered $3.75 million, of which Husband received $1.25 million.
- In a 1999 brain-injury case, a client recovered $2.5 million, of which Husband received "several hundred thousand dollars."
- In a 2000 wrongful-death case, a client recovered $1.25 million, of which Husband received "[o]ne-third."
- In a 2003 leg-injury case, a client recovered $1 million, of which Husband received "[a]pproximately a third."
- In a case involving a tourist injured on a bike, the client recovered $2.5 million, of which Husband received "[o]ne-third."

Husband was also questioned about the status of twenty-five contingency-fee cases that were pending around the time the second divorce case was filed. He testified that eleven of the cases had settled, ten were still active, three were dropped, and he could not recall one of the cases. Of the cases that had settled, three settled in December 2005 and January 2006 for more than $1 million each, generating attorney's fees for Husband of $550,000.00, "one-third of [$] 1.25 million," and $250,000.00 to $280,000.00, respectively. Husband testified that "the last of what [he] regard[ed] as [his] larger personal injury cases" could return a $2 to $3 million recovery. Husband further explained that when evaluating whether to accept a new case, his "criteria are that it should be a good case with liability for a good person[,]" and the client have "large injuries and damages[.]"

### d. Wife's $283,000.00 category 1[14] assets and replenishment

Husband testified that during his marriage to Wife, he wrote several significant checks to Wife to pay for her various expenses. He stated that Wife would, for example, have a $30,000.00 plastic surgery and demand to be "refurbished." Husband could not recall which of Wife's separate accounts were refurbished.

Although Wife did not perform any work for Husband's law firm, she received monthly payroll checks of about $1,500.00 from Husband's law firm beginning in about 1998, soon after they married, and continuing until they separated in 2004. He paid Wife so she could have "an opportunity to have some income to establish come [sic] credit for herself, because her credit was awful." Husband also established a 401(k) retirement plan in Wife's name, and in order to "max out on her 401(k) contributions,"

at the end of every fiscal year for two years I would bonus her, pay FICA, pay social security, pay an enormous amount of taxes so that I could put some money into a retirement account for [Wife] so that she would have something.

Husband acknowledged that Wife would occasionally offer her advice on his cases, staffing of the firm, and advertising. Husband also referred to Wife in his law firm's promotional materials, and the firm's website stated that Husband "was married to Brenda Dickson who had formerly been an actress on the Young and the Restless."

Husband stated that Wife's premarital money was initially tied up in a bankruptcy estate, from which she received $200,000.00 in 1999 or 2000. In addition, Wife received $85,000.00 from a legal settlement. He agreed that he was not making a claim to Wife's American Savings Bank account. He was unaware of any financial debts that he or Wife owed to Wife's mother.

### e. Alimony

Husband believed that alimony would be unnecessary because Wife's share of the marital estate would be sufficient to meet her needs and Wife's alimony demands will "never end."

---

14. Under the system of property categorization embraced by the Hawai'i Supreme Court in *Tougas v. Tougas*, 76 Hawai'i 19, 27, 868 P.2d 437, 445 (1994), Category 1 property is "[t]he net market value (NMV), plus or minus, of all property separately owned by one spouse on the date of marriage (DOM) but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party."

With respect to the couple's standard of living, Husband testified that he and Wife took many domestic and international trips together during their marriage. They usually upgraded to business- or first-class air travel and stayed in very nice hotels. During the marriage, the couple ate out two to three times a week at nice restaurants.

### 2. Candon's testimony

Candon was offered by Husband as an expert in the areas of accounting, business valuation, business appraisals, and tax. Candon testified that he was retained to determine the fair market value (FMV) of Husband's law practice as of December 31, 1997 (the date nearest to the date of marriage) and the most recent practical date of December 31, 2005.

Candon testified that "as of December 31, 1997, the value of [Husband's] one hundred percent interest in the law corporation was $293,000[,]" based on a review of the law firm's financial statements, income-tax returns, obligations, receivables due, and advertising. Candon noted that the firm's primary asset in the 1997 appraisal was a "$600,795 loan to the shareholder[, Husband.]"

This appraisal was based on several assumptions: (1) FMV is "that price that ... a willing seller would accept, [a] willing buyer would pay for a specific property on a date where both parties are reasonably well-informed of the ... important information and there's no compulsion. No one's compelled to act"; (2) under Hawai'i case law, "professional good will, or good will attaching to an individual employed by the company, particularly as a sole practitioner," is not a marital asset "unless there's a contract with the corporation"; (3) the only way to value Husband's law firm was via an "asset based approach liquidation method" because attorneys can't compel their clients to work with any particular attorney, and "the only value to the corporation are those things that it does control and can sell"; (4) the firm's value was then lowered by subtracting a thirty percent "marketability discount" because the firm is a small "privately held company that is difficult to sell"; and (5) the

firm's active, unsettled, contingency-fee personal-injury cases were not part of the appraisal because "it's just not possible to value something that is speculative" and Husband "could leave the corporation and take those cases with him."

According to Candon, "what's important is ... the value of the assets and liabilities that ... the corporation controlled and could sell." "You wouldn't do an income approach on something like this because the income is dependent on [Husband's] continued involvement."

· Using similar assumptions, Candon testified that the firm's December 31, 2005 appraisal was $347,000.00. Candon noted that the firm's primary asset in 2005 was a $905,000.00 loan to Husband. Candon also stated that the 2005 personal-injury industry had changed from 1997 in that there was more competition for smaller settlements because of fewer jury trials. Although Candon was concerned about whether the loan to Husband was collectible, Candon's appraisal assumed that the loan could be collected in full.

Candon testified that he had no reason to suspect fraud, or to investigate fee-sharing checks totaling $1.1 million that were paid by Husband's law firm to other attorneys in 2005. He stated that writing large fee-sharing checks during a pending contentious divorce proceeding did not necessarily raise a red flag about possible fraud, and based on the nature of the valuation approach he used, "[i]t was not necessary or relevant to explore fee[-]sharing agreements." Candon explained that the fee-sharing agreements would be relevant as of the valuation date if the business expected to receive or was obligated to make payments. However, "as a practice, business practice, ... during the course of the year, it would not be relevant." He further indicated that he "did not conduct a forensic investigation looking for fraud in the business ... [s]o [he] did not look at the individual checks" to determine whether they were paid out for a legitimate business reason.

## B. *Wife's Trial Evidence*

### 1. *Dwyer's testimony*

Dwyer recalled that he has previously served as co-counsel with Husband for two cases.

For the first fee-sharing case, Dwyer received from Husband a $203,123.70 check dated March 5, 2004. Dwyer received twenty-five percent and Husband received seventy-five percent of the total fee. Dwyer stated that although he was not the trial attorney, he was "involved in making virtually any strategic decisions" and for client relations.

For the second fee-sharing case, Dwyer stated that he received from Husband a $84,374.46 check dated December 29, 2004. This was approximately twenty-five to thirty percent of the total fee paid by the client. Dwyer could not recall whether he was named as co-counsel on the pleadings. He stated that he did not prepare any pleadings but had input on significant pleadings.

### 2. *Starshak's testimony*

Starshak, an attorney practicing in the areas of tax, pension, and estate planning, testified that he first began doing legal work for Husband in the "[e]arly nineties" involving "tax planning with regard to [Husband's] assets." Starshak could not recall if he had provided advice to Husband and Wife with respect to the filing of joint tax returns. He admitted to creating Husband's law firm's 401(k) plan but could not recall meeting with Wife about the plan.

Starshak prepared the IRA Agreement which provided that Wife would get half of Husband's IRAs in the event of a divorce. Starshak recalled telling Wife via telephone that he was "not her attorney, [he was] not representing her, [he was] representing [Husband], the matter that—that they were dealing with was something that required independent representation, and she should get her own lawyer." Starshak denied that he was directed by Wife, instead of Husband, to draft the IRA Agreement.

The family court precluded Wife's attorney from questioning Starshak about the IRA Agreement, joint tax returns filed by Husband and Wife, and a 401(k) plan set up for Wife, citing attorney-client privilege between Starshak and Husband. Additionally, the family court refused admission of the IRA Agreement through Starshak because Wife had not provided this document to Husband as a trial exhibit prior to trial.

### 3. *Wife's testimony*

Wife testified that her doctor had advised her not to travel to Hawai'i for the trial because she was being treated for shortness of breath, anxiety, and a clogged artery, and was taking various medications.

Wife related that she met Husband in July 1996, when he reviewed her then-divorce case, and the couple married in December 1997. Wife was an actress on a television soap opera for over a decade, ending in 1987. She did not work as an actress during her marriage to Husband, and she estimated that she would need $25,000.00 per month to resurrect her acting career.

#### a. *Division of the Nu'uanu and Los Angeles properties*

Wife testified that the Nu'uanu property is solely titled in her name. When asked how this occurred, Wife explained: "I believe that [Husband] put my name on the title because he wanted me to feel secure. That I would have the equity in the house." Wife agreed that Husband did not intend to gift the entire Nu'uanu property to her, "just the interest in the house" or equity. When the Nu'uanu property is sold, Wife said, she would like the proceeds to be used to pay off the balance on the mortgages for the Los Angeles and Nu'uanu properties, and then split the remaining proceeds evenly between Husband and Wife.

With regard to the Los Angeles property, Wife testified that Husband

> always said that I would get the condo, . . . which is why the condo wasn't sold to begin with. It was always agreed upon that I would get that condo and he'd have the house.
>
> In the 2004 agreement, there was a quitclaim deed where I quitclaimed the house

to him and he quitclaimed the condo to me. And it was always agreed upon that I would get that condo, which is why we didn't sell it from the very get-go.

. . . .

. . . [E]ven when we were having trouble in 2005, he always promised that I would have that condo. That's why he didn't go off and sell it right away.

(Formatting altered.)

### b. The AITD

Wife testified that the couple negotiated the AITD during their first separation in contemplation of divorce in 2004, but they reconciled shortly thereafter. Wife stated:

We had a negotiated contract in 2004, and . . . we signed the contract in 2004. But we went right back together almost immediately. . . . And we still had problems, but we hoped that it would work out. So we never initiated the contract.

Wife related that Husband filed the complaint in the second divorce case in December 2005.

### c. The IRA Agreement

Wife testified that during the marriage, the couple reached an agreement whereby she would receive one-half of several financial accounts, including Husband's premarital retirement accounts. Wife explained that

[Husband] had offered it up. He was very, very happy with the work that I was doing on the house and our lives and the way the office was going, and he had offered up the agreement. And he said because he loved me and he wanted to see me taken care of. And so he offered it up and—and put it together.

Wife's understanding of the agreement was that she "was to get half of all the IRAs, half of all the annuities, half of the [Charles Schwab (Schwab) securities accounts], and half of the 401(k)'s." At the time they signed the agreement, Wife said, "[t]here were no contingencies." Sometime during the divorce proceedings, however, Husband removed Wife's name as a beneficiary and "put them under his children's name[.]"

As to whether Wife believed that Starshak was her attorney, Wife testified that she called Starshak regarding the IRA Agreement; however, she "just thought he was an accountant" and he did "all of our integral things, more integral parts of the business."

### d. Husband's Law Firm

Wife expressed her belief that she was

entitled to a percentage of every case in [Husband's] firm. From the day that that was signed on the dotted line it becomes a part of the firm. He's investing our money in those cases and that—those cases are a part of the firm. . . .

And we have a track record—my husband has a track record. Number one, we've made in a five-year period, if you spread it out, [$] 2.1 million per year. I believe if I look at that case list there's probably, um, 6 to 10 million dollars of fees, and I certainly believe that I'm entitled to a portion of it because I helped build that office.

Wife stated that for her share of Husband's law firm, compensation totaling "five percent of the cases would be fair."

With respect to her role in Husband's firm, Wife testified that she suggested that Husband hire a young associate instead of a partner and reduce his office staff. She also assisted with office renovations and recommended changes to Husband's advertisements to highlight the large settlements and recoveries he had effectuated. She also explained her advisory role, stating that they

talked about the office every single night, every single conversation, every single problem, how to deal with it, what to say and how to say it. And every—all—I worked on all the big case—cases, including settlement tapes, settlement angles. Every single big case I gave him, um— how to project to the audience. . . .

She stated that Husband "gave [her] a paycheck because [she] helped him out[,]" "was a do-all girl in there" and he "understood [her] value to his business" and was "happy with the turnaround in his business[.]"

*e. Category 1 Credit and "Refurbishing"*

With respect to the couple's premarital assets and debts, Wife testified that she entered the marriage with $283,000.00 in premarital money, but Husband had a $300,000.00 IRS debt, a $675,000.00 business debt, a $200,000.00 mortgage debt, and his children's college expenses of approximately $280,000.00.

With regard to the couple's "refurbishing" routine, Wife testified that she lived off of her premarital money, other monies Husband gave her, "credit cards and things like that," and at the end of each year, Husband "would bonus [her] the money that [she] had spent out of [her category] 1 money and give it back to [her]." Wife estimated that she was reimbursed approximately $20,000.00 to $30,000.00 a month.

*f. Alimony*

Wife requested alimony of $25,000.00 a month for five years to resurrect her acting career. This would allow her to pay for a trainer, dance classes, a press agent, photographs, clothing, and cosmetic procedures. Wife also asked for a life-insurance policy on Husband to secure the alimony payments.

In describing the couple's lifestyle, Wife stated:

> Every New Year's we went to a gorgeous ball or gown, either in Paris or in London, or in New York. And we always ate at the finest restaurants. We saw the finest movies, the finest opera, the finest shows. Um, we went to the best parties, in the world. I'm talking the world. And this was our lifestyle.

(Formatting altered.) Wife did not believe that her spending during the marriage was excessive and questioned Husband's current debts because they "were never in debt during [the] marriage[.]"

Wife related that her credit was ruined because (1) Husband would not pay her credit-card bills; (2) she owes $43,000.00 in attorney's fees; (3) she owes a $15,000.00 California tax bill stemming from her first marriage, which Husband agreed, but failed, to pay; (4) she incurs $450.00 a month in rental-storage fees; (5) she owes several thousand dollars in doctor's fees and credit-card bills; and (6) she borrowed money from her mother.

Wife requested that her mother be paid back $235,000.00. She also requested that Husband pay all moving expenses related to the division of their personal property; her attorney's fees, credit-card bills, and doctor's bills; and the cost of shipping her vehicle to Los Angeles.

*C. The Family Court's Ruling*

Following closing arguments on April 13, 2006, the family court orally ruled with respect to the division of the property and debts of the parties, in relevant part, as follows:

> The court will award to [W]ife all of her bank accounts in her name. The court believes that has the present value of approximately $1500.
>
> Husband [sic] bank accounts in his name shall be awarded to [H]usband. This has an approximate value of about $5,000.
>
> Wife's Schwab account, approximately $48,000, shall be awarded to [W]ife.
>
> Husband has two Schwab accounts. They are category 1: 3500 and 5500. This shall be awarded to [H]usband. The award should not be a part of the calculation.
>
> The Coeur d'Alene appears to be an investment of some sort, but this shall be awarded to [H]usband, approximately a $1500 value.
>
> PanAm Silver appears to be some sort of investment. This shall be awarded to [H]usband in the approximate amount of $2500.
>
> The Jaguar, however, is in the lease I believe with the ALC Corporation. This shall be part of the corporation. It shall be awarded with the corporation.
>
> Mercedes–Benz 2002, approximate value of $38,000, shall be awarded to [W]ife.
>
> Mercedes–Benz 2000, approximate value of $34,000, shall be awarded to [W]ife.
>
> Both properties, that is Nu'uanu and the [Los Angeles properties] shall be sold.

Proceeds shall be divided. We'll address that later.

The law practice, the ALC, is a category 1. There is a category 2 value. The court will find that the value is $54,000. So this is divisible and this shall be awarded to [H]usband.

The Schwab IRA accounts, the court will address these by the last two digits of the account number. Account number 68, this is in [H]usband's name. This is a mixed category 1, category 2. The court believes the category 2 portion is $217,000, and this category 2 shall be awarded to [W]ife. [15]

IRA last two digits 42, this has the total value of [$] 211,000. This is category 1 and category 2. The category 2 amount is $23,000 and this shall be awarded to [H]usband.

Account 90, this is also category 1, but there is $17,000 in category 2 property, and this shall be awarded to [H]usband.

Account last two digits 61, this is also category 1 property. There is, however, a loss of $2,000. The loss shall be cited to [H]usband.

The 401(k), I believe the account number is 74. Husband is—$257,000 divisible property. This shall be awarded to [H]usband.

Wife's 401(k), $140,000, this shall be awarded to [W]ife.

Wife has an additional IRA, approximately $3,000. This shall be awarded to [W]ife.

Household goods, the court approximates the value of household goods at $150,000. This will be divided equally between the parties, [$] 75,000 each.

Husband's jewelry, [$] 35,000, awarded to [H]usband.

Wife's jewelry, [$] 150,000, awarded to [W]ife.

The court has a notation here of approximately I believe it's 150 feet of clothing for wife. I believe that's furs and gowns. The court's not sure what the value is of that really approximate 50 yards of tangible property. The court will approximate this value at $35,000. This shall be awarded to [W]ife.

Art: Husband's art, [$] 3,000, awarded to [H]usband.

Wife's art, [$] 7,000, awarded to [W]ife.

There appears to be an annuity for [W]ife. The court does not have a value though, but it shall be awarded to [W]ife nonetheless.

Debts: Wife has a Bank of America VISA, [$] 4,000. This debt shall be assigned to [W]ife.

Wife has an American Savings Bank VISA, approximately $10,000. This shall be assigned to [W]ife.

Neiman Marcus debt, approximately $35,000 shall be assigned to [W]ife.

Macy's debt, [$] 2,000, that shall be assigned to [W]ife.

MBNA, [$] 8,000, this shall be assigned to [H]usband.

Bank of Hawai'i card, $8,000 shall be assigned to [H]usband.

Schwab VISA, [$] 8,000, shall be . . . assigned to [H]usband.

There is a debt to the ALC for [$] 241,000, shall be assigned to [H]usband.

There is a property tax debt though, but that should come out of the sale of the [Los Angeles] property.

The court notes also there's attorney's fees on both sides, and the advance.

The Nu'uanu and the [Los Angeles] property shall be sold as stated by the court, and of course the proceeds shall be divided equally between the parties after satisfaction of all the fees, costs associated with the sale, and any taxes that might be due.

Husband's request that he have full— full and sole authority regarding both properties is granted. The court specifically finds that [W]ife's ongoing uncup— uncooperative and combative nature would be most—would be most detrimental to the equalization share.

---

**15.** The family court subsequently clarified that the $217,000.00 was awarded to Wife as her

sale of those properties. Husband's request for authority is granted.

Wife's request for [H]usband to bear the expense of shipping of personal property, including the vehicle, is denied. All property awarded shall be shipped at expense of the awardee.

Husband's request for credit of the temporary alimony which was ordered by Judge Radius is denied. Temporary alimony shall be deemed terminated with April payment and this is based upon reasons set forth by [H]usband.

Wife's request for $25,000 a month alimony for five years, a total amount of [$] 1.5 million, is also denied for the reasons set forth by [H]usband.

Wife may have occupancy of the [Los Angeles property] until the property is sold. Wife shall cooperate with the sale and the showing. If [W]ife fails to cooperate, [H]usband is authorized to evict. Wife is required to pay for utilities. That will be electricity, gas, water, cable during the period of her occupancy.

All the household goods are divided equally by the parties. If the parties— parties have elected to alternately select pieces of the household goods, if they cannot agree, then all of the household goods in [the Nu'uanu property] shall be awarded to [H]usband and all household goods in [the Los Angeles property] shall be awarded to [W]ife.

All household goods shall be removed prior to closing of the sale of said property, which shall be forfeited to the buyer subject to liability for disposal of worthless or undesirable property.

Wife's position that she will have category 1 property that is $285,000 that has been since, in her words, refurbished. This is denied. The court does not believe that a final refurbishing would be proper in this case.

Wife's position that she is entitled to one-half of [H]usband's category 1 IRA is rejected.

Wife's position that her category 2 share of [H]usband's law practice be supplemented above and beyond [Candon's] report is rejected.

The court notes that the divisional property does result in an equalization payment of $137,500 be payable from [W]ife to [H]usband. The court will not order equalization pursuant to [H]usband's position.

All parties shall bear their own attorney's fees subject to Rule 68 and subject to Judge Radius's decree—I'm sorry—Judge Radius's order regarding [second counsel's] request.

(Footnote added.)

The family court filed its divorce decree on May 18, 2006, which memorialized the oral ruling.

### POST–DECREE PROCEEDINGS

On May 31, 2006, Wife filed a "Motion for Reconsideration of Divorce Decree Filed May 18, 2006 and for New Trial" (May 31, 2006 Motion for Reconsideration), in which she argued that (1) she was prejudiced by the family court's decision to not extend the pretrial deadlines; (2) she was entitled to enforce the IRA Agreement; (3) she was entitled to $285,000.00 in premarital property; (4) she was entitled to alimony; (5) the Nu'uanu property is solely titled in Wife's name; and (6) the appraisal of Husband's law firm "did *not* take into account the value added to the business in 2006[,]" and the "multimillion dollars in fees received in the months preceding the trial" should be included.

On July 17, 2006, the family court filed its "Order Denying Without Hearing [Wife's] May 31, 2006 Motion for Reconsideration of Divorce Decree Filed May 18, 2006 and for New Trial[.]"

Wife filed her notice of appeal on June 16, 2006. In connection with this appeal, the family court denied Wife's request for a transcript of a January 10, 2006 hearing and to unseal a March 23, 2006 declaration by Wife's third counsel during the proceedings below.

On June 16, 2006, Wife filed a "Motion to Stay Execution of Divorce Decree Pending Appeal and for Waiver of Security[,]" which was denied by the family court on July 27, 2005.

On August 16, 2006, the family court's FsOF/CsOL, jointly signed by three family court judges,[16] was filed.

## DISCUSSION

### A. Whether the Family Court's FsOF/CsOL Violated HFCR Rule 52 [17]

Wife argues that "[b]ecause it is unclear which findings or conclusions each judge adopted, this case must be remanded for new findings" as the FsOF/CsOL "did not comply with" HFCR Rule 52(a). We disagree.

Aside from the first five FsOF, which concern such uncontested issues as the parties' date of marriage, their professions, and whether they had children of the marriage, each FOF falls under a subject heading that details the order to which a FOF under it relates. Similarly, except for the first three CsOL, which concern jurisdiction, each COL falls under a subject heading that details the order to which the CsOL under it relate. Thus, it is readily apparent that the judge who presided over a certain hearing approved of the FsOF and CsOL related to that hearing.

### B. Whether the Family Court Erred in Refusing to Enforce the AITD

It is undisputed on appeal that "[t]here was an [AITD] in the [parties'] first divorce case[.]" What is disputed is whether the family court erroneously concluded that the AITD was abandoned by the parties and was therefore unenforceable.

This court has previously stated that

[t]he abandonment of a contract is a matter of intention to be ascertained from the relevant facts and attendant circumstances. The abandonment of a contract need not be expressed but may be inferred from the conduct of the parties and the attendant circumstances. A contract will

be treated as abandoned when one party acts in a manner inconsistent with the existence of the contract and the other party acquiesces. Abandonment need not be expressed; it may be inferred from the conduct of the parties and the attendant circumstances. The abandonment of a contract discharges its obligations.

*Dring v. Dring*, 87 Hawai'i 369, 376, 956 P.2d 1301, 1308 (App.1998) (citations and quotation marks omitted). In *Anderson v. Oceanic Props., Inc.*, 3 Haw.App. 350, 358, 650 P.2d 612, 618 (1982), we also noted that

[a]bandonment is evidenced as long as there is a voluntary relinquishment of a right or of property with the intention of not reclaiming it or reassuming its ownership or enjoyment. Intent to abandon and an external act effecting the intent must be shown. Abandonment need not be expressed; it may be inferred from the conduct of the parties and the attendant circumstances.

(Citations omitted). Applying the foregoing principles, we conclude that the family court did not err in holding that the parties had abandoned the AITD.

1.

In its August 16, 2006 FsOF/CsOL, the family court entered twenty-three FsOF and seven CsOL, which supported its oral and written orders denying Wife's motion to enforce the AITD and concluding that the AITD had been abandoned and was unenforceable. The family court found, in relevant part, as follows:

22. There was an [AITD] in the first divorce case. . . .

23. However, [Husband] did nothing to pursue or perfect that agreement and did not move forward to obtain a divorce in [the first divorce case].

---

16. The FsOF/CsOL was signed by Judges Radius, Enright, and Choy.

17. HFCR Rule 52(a) provides, in relevant part:
    **FINDINGS BY THE COURT.**

    **(a) Effect.** In all actions tried in the family court, the court may find the facts and state its conclusions of law thereon or may announce or write and file its decision and direct the entry of the appropriate judgment; except upon notice of appeal filed with the court, the court shall enter its findings of fact and conclusions of law where none have been entered, unless the written decision of the court contains findings of fact and conclusions of law.

24. [Wife] also did nothing to pursue or perfect that agreement and did not move forward to obtain a divorce in [the first divorce case].

25. At some point during the pendency of [the first divorce case], the parties reconciled.

26. If the written AITD was sent to [Wife's] counsel in September of 2004 as [Wife] claimed, there was no action taken to perfect the agreement before [the first divorce case] was dismissed on October 27, 2004.

27. Neither party filed a motion to reinstate [the first divorce case] after it was dismissed on October 27, 2004.

28. [Wife] failed to raise the alleged AITD in her Answer to Complaint for Divorce in [the second divorce case,] which she filed on January 13, 2005.

29. In her Answer to Complaint for Divorce in [the second divorce case], [Wife] specifically requested "an equitable distribution of the marital estate, assets and debts" rather than requesting the enforcement of the property division terms of the alleged AITD.

30. In her Answer to Complaint for Divorce in [the second divorce case], [Wife] also stated that [Husband's] claim that she wasn't entitled to an award of spousal support was barred by HRS § 580–47(a). [Wife] did not state or assert that the alleged AITD awarded her alimony in the amount of *$14,000.00* a month for four (4) years.

31. [Wife's] Answer to Complaint for Divorce in [the second divorce case] was prepared by the same attorney who prepared the alleged AITD . . . .

32. [Wife] didn't raise or assert the alleged AITD in the first eight (8) months following the filing of the Complaint for Divorce in this case on December 22, 2004. In fact, [Wife] (through her first attorneys in this case . . .) requested mediation . . . in an attempt to settle the case.

33. Neither [Wife] nor her first attorneys in this case ever raised or asserted the alleged AITD during the mediation.

34. [Wife] conducted significant discovery in this case, both during and after the mediation. Among other things, [Wife] subpoenaed documents from [Husband's] law firm, as well as four (4) other law firms that co-counseled with [Husband] on certain cases, in an effort to obtain financial information about [Husband] and his cases.

35. On June 22, 2005, [Wife] made a global settlement offer, through her first attorneys in this case, pursuant to Rule 68, [HFCR]. [Wife's] settlement offer didn't mention the alleged AITD at all and didn't resemble the alleged AITD in any significant way. In fact, it differed drastically from the alleged AITD in the areas of alimony, division of the real properties, and an equalization payment.

36. HFCR 68 offers are made in anticipation of *trial* and are made when the offering party believes that he or she can do *better* than the offer if the case goes to trial.

37. During the first eight (8) months of this case, [Wife] *never* filed a motion to enforce the alleged AITD, *never* provided a copy of it to [Husband], and *never* suggested or implied in any way that she thought it was the controlling agreement in this case. Instead, [Wife] initiated substantial discovery in an effort to obtain much more alimony and a much greater property division award than she would have had under the alleged AITD.

38. [Wife] admitted that she returned to Honolulu in January of 2005 to try and obtain more than she "might be owed" under her [AITD].

39. The actions of the parties in this case . . ., the period of time that had passed since this case began, and all the financial transactions that had occurred since the dismissal of [the first divorce case] indicated that neither party intended to rely on the agreement in the first divorce case[.]

The family court entered the following CsOL as to the AITD:

18. A divorce agreement is valid and enforceable if otherwise valid as a contract. *Labayog v. Labayog*, 83 Hawai'i 412, 428, 927 P.2d 420, 436 (1996). "The elements of

a contract include offer and acceptance, consideration, and mutual assent to terms essential to the formation of a contract." 17 C.J.S. Contracts § 2 (1999).

19. "[A]bandonment of a contract is a matter of intention to be ascertained from the relevant facts and attendant circumstances. Abandonment need not be expressed; it may be inferred from the conduct of the parties and the attendant circumstances. A contract is abandoned when one party acts in a manner inconsistent with the existence of the contract and the other party acquiesces." *Kuroda v. Kuroda*, 87 Hawai'i 419, 427, 958 P.2d 541, 549 (App.1998) (internal quotation marks and citations omitted).

20. HFCR 12(b) states, in pertinent part, that "Every defense, in law or fact, to a claim for relief in any pleading, . . . shall be asserted in the responsive pleading thereto . . . ."

21. The Family Court properly took judicial notice of the file in [the first divorce case].

22. There was an agreement incident to and in contemplation of divorce in the first divorce case[.] However, both parties thereafter acted in a manner that was inconsistent with the existence of that agreement.

23. Based on the actions and non-actions of the parties, both parties abandoned the agreement.

24. The alleged AITD was unenforceable and [Wife']s September 19, 2005 Motion to Enforce [AITD] was properly denied by the Family Court.

There is substantial evidence in the record to support the FsOF, upon which the family court based its CsOL that the AITD was abandoned.

### 2.

Wife claims that FsOF 25, 26, and 28 to 38 are clearly erroneous because they were not mentioned by the family court in its oral and written rulings denying Wife's motion to enforce the AITD. However, HFCR Rule 52(a) specifically requires FsOF to be entered by the family court after a notice of appeal is filed. The FsOF challenged by Wife merely explain the factual bases for the family court's determination that (1) both parties acted in a manner inconsistent with the existence of the AITD after its execution; and (2) based on the actions and non-actions of the parties, both parties had abandoned the AITD.

### 3.

Relying on *Dring*, where a husband and wife reconciled and lived together for three years after signing an AITD, and *Kuroda v. Kuroda*, 87 Hawai'i 419, 958 P.2d 541 (App. 1998), where a complaint for divorce was filed seventeen years after the execution of an AITD, Wife contends that it was improper for the family court to conclude that the AITD was abandoned based on a FOF that Husband and Wife reconciled after signing the AITD. In *Dring*, the family court concluded as a matter of law that the reconciliation of the parties and their living together after the signing of an AITD was an abandonment of the AITD. *Dring*, 87 Hawai'i at 373, 956 P.2d at 1305. On appeal, this court held that the family court's COL was wrong because

(a) the . . . reconciliation of the parties and their living together was not *ipso facto*, as a matter of law, an abandonment of the [AITD], and (b) the evidence on the record that the parties did not abandon the [AITD] by or during their . . . reconciliation or thereafter presents genuine issues of material fact that must be resolved by [FsOF] before the family court can enter its [COL] deciding the abandonment issue.

*Id.* at 376, 956 P.2d at 1308. In other words, *Dring* stands for the proposition that abandonment of an AITD does not automatically occur upon reconciliation. In this case, the reconciliation of the parties was just one factor considered by the family court in determining that the AITD had been abandoned.

In *Kuroda*, this court never determined that the seventeen-year lapse between the signing of the AITD and the divorce complaint did not constitute abandonment; we only ruled that a motion in limine was not the proper vehicle for deciding the enforceability

of an AITD. *Kuroda,* 87 Hawai'i at 428, 958 P.2d at 550. Moreover, because we concluded that the AITD was unconscionable, we never reached the issue of abandonment of the AITD. *Id.*

4.

Wife argues that FsOF 33, 35, and 36 "are improper references to settlement negotiations" which, pursuant to Hawaii Rules of Evidence (HRE) Rule 408 (1993),[18] should not have been relied on by the family court to determine that the AITD was abandoned. However, the family court does not appear to have treated the parties' mediation and Wife's settlement offer as evidence of Wife's liability or the invalidity of Wife's claim for enforcement of the AITD, in violation of HRE Rule 408. Rather, the family court considered Wife's participation in mediation and Wife's global settlement offer for another purpose, namely that Wife's actions were consistent with abandonment of the AITD.

5.

Wife states that Hawai'i has a strong public policy favoring the resolution of disputes through settlement agreements and courts should do all that can be done legally and properly to "support agreements which have for their object the amicable settlement of doubtful rights of the parties." We agree. However, we decline to extend such a policy to require the enforcement of an agreement that the parties have abandoned.

6.

Wife claims that Husband had the burden of proving by clear and convincing evidence that the AITD was abandoned. Wife has not cited any Hawai'i case law in support of this claim, nor argued convincingly that we should follow the rather conclusory statements in two out-of-state cases that she cites for this proposition. Moreover, it is not clear from the record what burden of proof the family court applied in this case, and nonetheless there is sufficient evidence in the record on appeal to support the family court's conclusion that the AITD was abandoned under the higher clear-and-convincing-evidence standard of proof.

7.

Wife claims that the provisions of the AITD awarding the Nu'uanu property to Husband and the Los Angeles property to her were "clearly executory, and converted those assets to 'separate property' when the [AITD] was signed." Wife did not raise this argument before the family court and, therefore, the issue is waived. *State v. Moses,* 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003).

8.

Finally, Wife argues that *In re Marriage of Vella,* 237 Ill.App.3d 194, 177 Ill.Dec. 328, 603 N.E.2d 109 (1992), supports a conclusion that the AITD was not abandoned. In *Vella,* the parties to a divorce proceeding executed a marital settlement agreement that provided for distribution of both cash and property. *Id.* at 110. Although the divorce proceeding was subsequently dismissed for want of prosecution, the parties substantially performed the terms of the agreement. *Id.* The parties later reconciled for a period of time, and when the reconciliation failed, the wife filed a second complaint for dissolution of marriage. *Id.* The trial court held that the marital settlement agreement was invalid and unenforceable because it had been executed pur-

18. HRE Rule 408 provides as follows:
    **Compromise, offers to compromise, and mediation proceedings.** Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, or (3) mediation or attempts to mediate a claim which was disputed, is not admissible to provide liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations or media-

tion proceedings is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations or mediation proceedings. *This rule also does not require exclusion when the evidence is offered for another purpose,* such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.
(Emphasis added.)

suant to a divorce proceeding that had been dismissed and the agreement had not been subject to court approval. *Id.* at 110–11. The Illinois Court of Appeals reversed, holding that the marital settlement agreement was enforceable because its clear and unambiguous terms indicated "the intent of the parties to be bound upon execution of the agreement, rather than upon approval by the court," *id.* at 113, and substantial performance of the contractual terms had taken place after the agreement was executed. *Id. Vella* thus did not involve abandonment of the marital settlement agreement.

### C. *Whether the Family Court Erred in Refusing to Enforce the IRA Agreement*

At a hearing on April 13, 2006, the family court, without explanation, orally ruled: "Wife's position that she is entitled to one-half of [H]usband's category 1 IRA is rejected." In its August 16, 2006 FsOF/CsOL, the family court found, with respect to the IRA Agreement, as follows:

220.  [Wife] also alleged that [Husband] had agreed to give her one-half (1/2) of his IRA funds (including his premarital IRA funds), one-half (1/2) of his Annuities (including his premarital Annuities), one-half (1/2) of his . . . Schwab securities accounts (*including his premarital . . . Schwab securities account*), and one-half (1/2) of his 401(k) plan in the event of their divorce.

221.  [Wife] did not raise this alleged agreement in her Answer to Complaint for Divorce.

222.  An alleged agreement was offered into evidence by [Wife], but was not received into evidence because [Wife] failed to provide her trial exhibits to [Husband] by the deadline set in Pretrial Order No. 1.

223.  [Husband's] agreement applied only to his IRAs and his agreement to give [Wife] one-half (1/2) of his IRAs was conditional.  [Husband] agreed to provide [Wife] with security in the event that he breached his promise to protect her from his tax liens and to reimburse her for the money she spent that was her premarital money.  [Husband's] agreement was not

intended to extend beyond the point he satisfied his promise to [Wife].

224.  [Husband] satisfied his promise to [Wife] by paying his tax liens and reimbursing [Wife] for the money she spent that was her premarital money (i.e. he "refurbished" her account(s) in full).

225.  [Wife] testified that [Husband] agreed to give her one-half (1/2) of his IRAs, Annuities, . . . Schwab securities accounts, and 401(k) plan because he loved her.

226.  [Husband's] explanation was the more credible explanation here and [Wife] was not entitled to one-half (1/2) of [Husband's] premarital (and therefore Category 1) IRA funds, one-half (1/2) of [Husband's] premarital (and therefore Category 1) Annuities, and one-half (1/2) of [Husband's] premarital (and therefore Category 1) . . . Schwab securities account.

Our conclusion that the family court abused its discretion in failing to extend pretrial deadlines is dispositive of Wife's claim that the family court erred in refusing to enforce the IRA Agreement on the basis of Wife's failure to provide the IRA Agreement to Husband by the deadline set forth in Pretrial Order No. 1.

■  The family court did not explain why Wife was required to raise the IRA Agreement in her answer.  Husband's complaint was a one-page, check-off form document. Item 5 of the complaint requested, as to division of assets, that "[a]ll assets my spouse and I own should be divided in a just and equitable way."  Husband did not allege in his complaint that the IRAs referred to in the IRA Agreement were his separate property and not subject to division.  Therefore, the existence of the IRA Agreement, which was clearly relevant in categorizing the IRAs as Husband's or Wife's separate property, was not "a defense, in law or fact, to a claim for relief" that Wife was required to assert in her answer pursuant to HFCR Rule 12(b) (2000).

■  The IRA Agreement clearly and unambiguously provided that Wife would get one-half of four of Husband's IRAs in the event of divorce. There were no conditions

attached to the IRA Agreement. The Hawai'i Supreme Court has recognized the well-settled principle that

> courts should not draw inferences from a contract regarding the parties' intent when the contract is definite and unambiguous. In fact, contractual terms should be interpreted according to their plain, ordinary meaning and accepted use in common speech. The court should look no further than the four corners of the document to determine whether an ambiguity exists.

*State Farm Fire & Cas. Co. v. Pac. Rent–All, Inc.*, 90 Hawai'i 315, 324, 978 P.2d 753, 762 (1999) (citations omitted). Where a writing is found to be clear and unambiguous and "represents the final and complete agreement of the parties," the parol evidence rule bars evidence "of prior contemporaneous negotiations and agreements that vary or alter the terms of a written instrument." *Id.* (citation omitted). Thus, "[o]nce the parties execute an instrument which contains their whole agreement, their previous negotiations and agreements are legally ineffective and evidence relating to those previous negotiations or agreements is irrelevant regardless of who offers it." *Akamine & Sons, Ltd. v. Am. Sec. Bank*, 50 Haw. 304, 310, 440 P.2d 262, 266 (1968).

However, it is equally well-settled that, because the parol evidence rule presupposes a valid agreement, it will not prohibit evidence showing there was no agreement or enforceable agreement.

*United Pub. Workers, AFSCME, Local 646, AFL–CIO v. Dawson Int'l, Inc.*, 113 Hawai'i 127, 140–41, 149 P.3d 495, 508–09 (2006).

In this case, the family court did not determine that the IRA Agreement was unconscionable, abandoned, or entered into pursuant to fraud. Therefore, it was improper for the family court to allow Husband to testify about conditions outside the four corners of the IRA Agreement that would render the IRA Agreement unenforceable.

D. *Whether the Family Court Erred in Refusing to Enforce the Quitclaim Deed to the Nu'uanu Property*

■ Wife admitted at trial that Husband did not intend to gift the entire Nu'uanu property to her. She thereby confirmed Husband's testimony that the Nu'uanu property was titled in her name alone due to a mistake in the preparation of the conveyance documents. The family court did not err in categorizing the Nu'uanu property as marital property and not Wife's separate property.

E. *Whether the Family Court Abused Its Discretion in Denying Wife's Motions to Continue Pretrial Deadlines*

■ Pursuant to HRS § 571–8.5(a)(6) (2006), "district family judges may . . . [g]rant continuances in proceedings before them[.]" (Formatting altered.) The Hawai'i Supreme Court has also stated that "[a] court has the discretion to grant or refuse a continuance of a proceeding in the orderly administration of justice. This discretion is a judicial one and is subject to review for abuse." *Sapp v. Wong*, 62 Haw. 34, 41, 609 P.2d 137, 142 (1980). "Generally, to constitute an abuse of discretion a court must have clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 114, 839 P.2d 10, 26 (1992).

The record on appeal indicates that Wife made numerous attempts to continue the pretrial deadlines set by a November 28, 2005 order. However, Wife's January 11, 2006 pro se request to cancel trial (and implicitly, the pretrial deadlines) was never scheduled for hearing. Her February 24, 2006 motion requesting a continuance of trial and pretrial deadlines was orally denied by Judge Choy on March 8, 2006, on grounds that the case was over a year old and had to be heard. Wife's March 20, 2006 motion seeking reconsideration of Judge Choy's March 8, 2006 oral order denying her motion to continue trial and pretrial deadlines was initially returned to Wife's counsel, unfiled, with a notation that Husband's counsel would prepare an order denying Wife's motion. Wife's April 4, 2006 motion to extend pretrial deadlines was also denied, on grounds that the family court judge hearing the motion

had no "ability or legal basis to rule upon" the motion once it had been denied by another judge.

Wife contends that the family court abused its discretion when it denied Wife's multiple requests for an extension of pretrial deadlines and sanctioned her for missing the deadlines by excluding evidence. Based on the circumstances of this case, we agree.

1.

Husband acknowledges that Pretrial Order No. 1 imposed "very, very strict deadlines ... [m]ore deadlines than normally would be set." This was not, however, a normal, run-of-the-mill divorce case. Division of a multi-million-dollar marital estate that included two expensive residences and valuation of Husband's thriving law practice were at issue.

After Husband filed his complaint for divorce on December 22, 2004, Wife conducted extensive discovery. From March 30, 2005 through July 2005, the parties engaged in prolonged mediation. If mediation had been successful, there would have been no need for trial or the retention of experts.

On October 24 and 28, 2005, the parties engaged in expensive and extensive litigation regarding the enforceability of the AITD. If the family court had determined that the AITD was enforceable, there would have been no need for trial or the services of Wife's named valuation expert. The family court entered its written order denying Wife's motion to enforce the AITD on November 28, 2005.

On December 20, 2005, the family court entered a written order granting Wife's second counsel's December 8, 2005 motion to withdraw. In light of the case events that occurred after the filing of the complaint on December 22, 2004, it is understandable that when Wife's second counsel was allowed to withdraw, Wife's named valuation expert had not yet been requested to value Husband's law practice or the marital estate. Since the scheduling order required expert reports to be exchanged by January 20, 2005, there was very little time for Wife's valuation expert to review the financial records of the marriage and Husband's law practice, perform his valuation analysis, and complete his expert report.

At this crucial period, however, Wife was without counsel. Wife claimed that when her second counsel withdrew right before Christmas 2005, she experienced great difficulty retaining new counsel because many attorneys were unavailable due to the busy holiday season, or attorneys claimed conflicts of interest because they knew Husband. In late January 2006, Wife retained Purcell, who was willing to represent Wife only if trial were continued since Purcell had a conflict on the scheduled trial dates. When the family court refused to continue the trial dates, Purcell withdrew and Wife was without counsel during several critical weeks leading up to trial.

Furthermore, although the family court orally ordered Husband on November 4, 2005 to advance Wife $40,000.00 for her fees and expenses to prepare for trial, Husband did not pay the ordered amount into court until the family court, on December 20, 2005, granted Wife's motion to compel payment. Thereafter, Wife's second counsel claimed entitlement to the full amount, tying up use of the funds. It was not until March 24, 2006, two and a half weeks before trial, that the family court finally released $30,000.00 of the deposited funds to Wife's then-counsel to cover Wife's attorney's fees and legal costs, including expert fees. By then, the deadlines for the exchange of expert reports and trial exhibits had long passed.

In summary, the record reveals that although trial was delayed a month to accommodate the personal schedule of the assigned trial judge, and although Husband agreed to extend the pretrial deadlines for both parties to allow Wife's counsel and Husband, if he so chose, "to conduct additional discovery, take depositions, and otherwise prepare for trial on April 10th and 11th," the family court refused to grant Wife *any* extension of pretrial deadlines. Furthermore, the family court did not explain why it denied Wife's various motions for an extension of pretrial deadlines, except for one family-court judge who stated that he did not believe he was authorized to grant an extension because two

prior motions for continuance had already been denied.

2.

In addition to refusing to grant Wife an extension of pretrial deadlines, the family court sanctioned Wife for failing to meet the deadlines by granting Husband's motion to exclude all of Wife's expert witnesses, expert reports, trial exhibits, evidence not provided in discovery, and claims not raised by Wife in her position statement. Wife could therefore only defend her positions with very limited evidence and oral testimony and was severely prejudiced in adducing proof for her claims to the marital estate.

Other courts have concluded that a trial court abuses its discretion when it fails to consider relevant factors before sanctioning a party for submitting statements or reports after a discovery deadline.

In *United States v. Mavrokordatos*, 933 F.2d 843, 845 (10th Cir.1991), the trial court precluded six government witnesses from testifying because their statements or reports were produced to defense counsel after the discovery deadline. The Tenth Circuit Court of Appeals initially noted that a trial court must consider the following factors in determining the appropriate sanction for noncompliance of a discovery order:

(1) the reasons the government delayed producing the requested materials, including whether or not the government acted in bad faith when it failed to comply with the discovery order; (2) the extent of prejudice to the defendant as a result of the government's delay; and (3) the feasibility of curing the prejudice with a continuance.

*Id.* at 847 (internal quotation marks omitted). The court of appeals concluded, after reviewing the record, that "it is apparent that the trial court did not consider these factors[,]" *id.*, and therefore, "the sanctions imposed by the trial court were an abuse of discretion." *Id.* at 848.

In *Long v. Steepro*, 213 F.3d 983, 985 (7th Cir.2000), the trial court sua sponte dismissed an action brought by the plaintiff against prison employees because the plaintiff failed to file his evidentiary lists by the deadline set in a scheduling order. The court of appeals held that the trial court abused its discretion in imposing the dismissal sanction. *Id.* at 988–89. The court of appeals noted:

In determining whether the sanction of dismissal constituted an abuse of discretion, we look to the entire procedural history of the case. "The choice of appropriate sanctions is primarily the responsibility of the district court," however, "the sanction selected must be one that a reasonable jurist, apprised of all the circumstances, would have chosen as proportionate to the infraction."

We are particularly vigilant in requiring proportionality "where the draconian sanction of dismissal is imposed." We often have noted that the interests of justice are best served by resolving cases on their merits; consequently, "the sanction of dismissal with prejudice must be infrequently resorted to by district courts in attempting to control their dockets and extirpate nuisance suits." This ultimate sanction is reserved for cases in which the offending party has demonstrated wilfulness, bad faith, or fault. "Absent these circumstances, the careful exercise of judicial discretion requires that a district court consider less severe sanctions and explain, where not obvious, their inadequacy for promoting the interests of justice."

*Id.* at 986 (citations and brackets omitted). Applying the foregoing standards, the court of appeals concluded that the plaintiff's actions did not warrant dismissal of plaintiff's case. *Id.* at 988. The court noted that the plaintiff, proceeding pro se, had timely prosecuted his complaint without incident for over one year. *Id.* at 986. His only misstep was his failure to file his evidentiary lists by the deadline set in the scheduling order. *Id.*

The defendants did not claim that the plaintiff acted wilfully, deliberately, or in bad faith, but only that his failure to comply with the deadline constituted "fault," justifying dismissal. *Id.* at 986–89. The court held:

We believe that the missed deadline in the present case was ... a "mere mistake." *Although [the plaintiff] was warned that dismissal was possible, it was*

*reasonable for him to believe that all proceedings were stayed pending a ruling from the district court on the summary judgment motion.* The reasonableness of [the plaintiff's] actions are confirmed by the actions of the defendants during the same time period. Although ordered by the court to submit a final settlement offer to [the plaintiff] by February 5, 1999, they did not comply. Instead, in a submission to the court on February 2, 1999, they stated that they were "currently not in a position to offer plaintiff a settlement proposal and will be in a position to discuss settlement after the court has ruled on the Defendants' Motion for Summary Judgment." *The defendants' submission suggested exactly what [the plaintiff] concluded: without a ruling on the summary judgment motion, the parties were in procedural limbo, and the deadlines of the Scheduling Order did not apply. Given [the plaintiff's] reasonable understanding that summary judgment could dispose of the case in its entirety, and given the defendants' actions confirming his belief that other deadlines were suspended pending a ruling on the motion, we cannot say that [the plaintiff] acted unreasonably when he failed to file his evidentiary list in compliance with the Scheduling Order.*

[The plaintiff's] failure simply is not the kind of "damning dilatory conduct normally associated with the sanction of dismissal." Indeed, even a cursory review of our case law reveals that [the plaintiff's] actions bear no resemblance to the egregious conduct of parties whose dismissals we have upheld....

. . . .

Where, as here, a "record of delay, contumacious conduct, or prior failed sanctions does not exist, the exercise of judicial discretion requires that the district court consider and explain the inappropriateness of lesser sanctions. The record does not reveal any consideration of alternative, lesser sanctions. Furthermore, at no time did the district court address the merits of [the plaintiff's] arguments or the special circumstances of his case." *The record reveals a "one size fits all" approach to violations, not one that "a reasonable ju-*

*rist, apprised of all the circumstances, would have chosen as proportionate to the infraction."*

District courts have considerable discretion in imposing sanctions to control their dockets. However, in choosing sanctions available to them under the Federal Rules, they must consider the circumstances of the individual case and, absent a showing of dilatory behavior, justify imposing the sanction of dismissal. The record reflects that the district court did not follow this established methodology.

*Id.* at 987–89 (emphases added; citations and footnote omitted).

In *Kamhi v. Waterview Towers Condo. Ass'n,* 793 So.2d 1033, 1035 (Fla.Dist.Ct.App. 2001), Waterview Towers Condominium Association (Waterview) filed an action for injunctive relief against Marjorie Kamhi (Kamhi), a condominium-unit owner, for violating a pet-control rule. The trial court set the matter for trial on February 21, 2000 and imposed various pretrial deadlines, including a December 10, 1999 deadline for submission of witness and exhibit lists. *Id.* Prior to the deadline, Kamhi's attorney filed a motion to withdraw due to irreconcilable differences, which was granted on December 13, 1999. *Id.* Kamhi's attorney did not file any witness and exhibit lists before the required deadline. *Id.* Kamhi's new counsel appeared at a January 11, 2000 status conference and moved to continue trial, but the trial court denied the motion. *Id.* On January 12, 2000, Waterview moved to compel Kamhi to file and serve her witness and exhibit lists that had been due on December 10, 1999. *Id.* Kamhi's second counsel agreed to file the lists no later than January 20, 2000. *Id.* However, without filing the lists, Kamhi's second counsel filed a motion to withdraw, which was granted. *Id.* Thereafter, the trial court sanctioned Kamhi by precluding her from presenting evidence or proffering testimony at trial. *Id.* at 1035–36. Kamhi then moved, pro se, for a continuance, claiming that she had found an attorney willing to represent her if she could get a continuance in order to accommodate the attorney's trial schedule. *Id.* at 1036. The trial court denied Kamhi's request and ordered that the case proceed as scheduled.

*Id.* At trial, Kamhi was unable to present any evidence or proffer testimony in defense of Waterview's claim, and the trial court enjoined her from violating the pet-control rule. *Id.*

On appeal, the Florida District Court of Appeal reversed, stating:

> When a party fails to comply with an order, the trial court has a broad spectrum of sanctions to impose, although the sanction chosen must be commensurate with the offense. Although striking a party's pleadings is the most severe sanction, it is appropriate where the offending conduct is flagrant, willful or persistent. "A deliberate and contumacious disregard of the court's authority will justify application of this severest of sanctions, as will bad faith, willful disregard or gross indifference to an order of the court, or conduct which evinces deliberate callousness." Absent evidence of a willful failure to comply or extensive prejudice to the opposition, however, the granting of such an order constitutes an abuse of discretion. It also has been found to be an abuse of discretion to strike pleadings where a litigant is punished for the failure of counsel, or where there is only a single failure to comply which did not result in extreme prejudice to the other side.
>
> *Although the trial court in this case did not strike Kamhi's pleadings, its order prohibiting her from presenting evidence and proffering testimony was tantamount to the severest of sanctions.* In its motion for sanctions, Waterview never pled prejudice or any basis for sanctions which included the striking of Kamhi's answer, entering a default or preventing Kamhi from presenting evidence or testimony at trial. At no time did the court make any findings that Kamhi consciously and deliberately disregarded the trial court's order to submit her witness and exhibit lists or that she acted in bad faith. Moreover, her failure to timely comply with the court's order was more a failure by her attorneys. In each instance, Kamhi was still represented by counsel when she failed to timely serve her witness and exhibit lists.

*Id.* at 1036–37 (emphasis added; citations omitted).

In *Maddox v. Stone,* 174 Md.App. 489, 921 A.2d 912, 914 (Md.Ct.Spec.App.2007), the Maryland Court of Special Appeals held that the trial court abused its discretion in striking one of the appellant's expert witnesses because of a lack of strict compliance with the scheduling order. The court stated:

> "[T]he governing principle" is that "the appropriate sanction for a discovery or scheduling order violation is largely discretionary with the trial court." But the Court [of Appeals] also qualified that "governing principle" by pointing out "the more draconian sanctions, of dismissing a claim or precluding the evidence necessary to support a claim, are normally reserved for persistent and deliberate violations that actually cause some prejudice, either to a party or to the court." *The scheduling order is not meant to function as a statute of limitations, and good faith substantial compliance with the scheduling order is ordinarily sufficient to forestay a case-ending sanction . . . .*
>
> Accordingly, although the decision of whether to exclude a key witness because of a party's failure to meet the deadlines in a scheduling order is generally committed to the discretion of the trial court, the imposition of such a draconian sanction must be supported by circumstances that warrant the exercise of the court's discretion in such a manner. . . .
>
> *Although the abuse of discretion standard for appellate review is highly deferential to the many discretionary decisions of trial courts, we nevertheless will reverse a decision that is committed to the sound discretion of a trial judge if we are unable to discern from the record that there was an analysis of the relevant facts and circumstances that resulted in the exercise of discretion . . . .*
>
> . . . .
>
> . . . *[T]he record must reflect that the judge exercised discretion and did not simply apply some predetermined position. Gunning v. State,* 347 Md. 332, 351, 701 A.2d 374 (1997) *(A "judge's unyielding adherence to a predetermined position*

amounts to a ... *failure to properly exercise discretion.*"); *Maus v. State*, 311 Md. 85, 108, 532 A.2d 1066 (1987) ("When a court must exercise discretion, failure to do so is error, and ordinarily requires reversal."); *Colter v. State*, 297 Md. 423, 428, 466 A.2d 1286 (1983) (*trial judge committed reversible error when he "applied a hard and fast rule of not granting a continuance* "); *Taliaferro [v. State]*, 295 Md. [376], 390, 456 A.2d 29 [ (1983) ] ("*The exercise of discretion contemplates that the trial court will ordinarily analyze the facts and not act, particularly to exclude, simply on the basis of a violation disclosed by the file.*"); *Scully v. Tauber*, 138 Md.App. 423, 431, 771 A.2d 550 [ (2001) ] ("When it is not clear that discretion was exercised, reversal is required."), *cert. denied*, 365 Md. 268, 778 A.2d 383 (2001); *Hart v. Miller*, 65 Md.App. 620, 627, 501 A.2d 872 (1985) ("*Failure to exercise choice in a situation calling for choice is an abuse of discretion, because it assumes the existence of a rule that admits of but one answer.*"), *cert. denied*, 305 Md. 621, 505 A.2d 1342 (1986).

*Maddox*, 921 A.2d at 919–20 (emphasis added; some citations omitted).

The court cited the following factors that should be considered in determining whether a discovery violation warrants the sanction of exclusion of evidence:

> [W]hether the disclosure violation was technical or substantial, the timing of the ultimate disclosure, the reason, if any, for the violation, the degree of prejudice to the parties respectively offering and opposing the evidence, whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance. Frequently these factors overlap. They do not lend themselves to a compartmental analysis.

*Id.* at 919–21 (formatting altered).

In this case, Husband did not object to a continuance of pretrial deadlines as long as the trial date remained the same. Nevertheless, the family court denied a continuance. There is no indication in the record that the family court weighed any factors in acting upon Wife's motion for a continuance of pretrial deadlines. Moreover, based on the family court's oral statements and the FsOF/ CsOL, it appears that the family court, in denying Wife's motion to extend the pretrial deadlines, treated the deadlines as statutes of limitations, "chiseled in concrete," and therefore sanctionable if violated.

Scheduling orders are clearly valuable tools for promoting the efficient management of a trial court's docket. However, as the Maryland Court of Special Appeals recognized in *Maddox*:

> [T]he imposition of a sanction that precludes a material witness from testifying, and, consequently, effectively dismisses a potentially meritorious claim without a trial, should be reserved for egregious violations of the court's scheduling order, and should be supported by evidence of willful or contemptuous or otherwise opprobrious behavior on the part of the party or counsel.

921 A.2d at 922. *See also Revco, D.S., Inc. v. Cooper*, 873 S.W.2d 391, 397 (Tex.App.1994) (holding that discovery sanctions "so severe they prevent a trial on the merits are warranted only where the record reflects a party's flagrant bad faith or counsel's callous disregard for the discovery rules").

Based on our review of the record and the circumstances of the instant case, we conclude that the family court abused its discretion when it refused to extend *any* pretrial deadlines and thereafter sanctioned Wife by precluding her from proffering evidence that was adduced in violation of the pretrial deadlines.

### F. Whether the Family Court Abused Its Discretion in Denying Wife's Motion to Continue Trial

In seeking a continuance of trial in this case, Wife argued, in summary, that (1) she did not have an attorney during a crucial time period between December 14, 2005 and late January 2006 and needed a continuance to complete discovery, retain experts, and prepare for trial; (2) her case was complex and the files were voluminous for a new attorney to sort through; (3) the attorney whom she wished to retain could not begin

trial preparation without a continuance because the attorney had a conflict on the scheduled trial date and had ascertained from a preliminary review of Wife's files that much work remained to be done to be ready for trial; and (4) Wife could not retain an attorney or a business evaluator until the family court released the $40,000.00 that Husband had deposited into court to cover her attorney's fees and costs.

In denying Wife's motion to continue the trial date, the family court noted: "[T]his is a weird case. It's well over a year old. It's even in a position to be dismissed when this matter proceeds to trial." The family court also mentioned that the trial had already been moved back a month (to accommodate the trial judge's schedule) and, therefore, the case "has to be heard. It has to be heard quickly."

In its FsOF/CsOL, the family court entered the following CsOL regarding Wife's motion to continue trial:

43. The Family Court has broad authority to control the presentation of evidence before it, including setting appropriate pretrial deadlines. "[C]ourts have ... inherent power to control the litigation process before them." *Richardson v. Sport Shinko (Waikiki Corp.)*, 76 Hawai'i 494, 507, 880 P.2d 169, 182 (1994).

44. A trial court has a duty to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witness from harassment and undue embarrassment." Rule 611(a), Hawai'i [sic] Rules of Evidence ("HRE"). "Pursuant to HRE 611(a), the Court has substantial discretion in exercising its control over the interrogation of witnesses." *Aga v. Hundahl*, 78 Hawai'i 230, 243, 891 P.2d 1022, 1035 (1995). *See also, Nature Conservancy v. Nakila*, 4 Haw.App. 584, 596, 671 P.2d 1025, 1034 (1983).

45. The Family Court also has authority to exercise control over the presentation of expert testimony. "A trial court may ... exercise supervision over the expert's

testimony, pursuant to HRE 611 (1993) and 403, to ensure that the testimony is not unnecessarily duplicative or prejudicial." *Tabieros v. Clark Equipment Company*, 85 Hawai'i 336, 394, 944 P.2d 1279, 1337 (1997).

46. "[T]he doctrine of 'law of the case' ... refers to the usual practice of courts to refuse to disturb all prior rulings in a particular case[.]" *Wong v. City & County of Honolulu*, 66 Haw. 389, 396, 665 P.2d 157, 162 (1983).

47. In the absence of compelling reasons, Judge ENRIGHT was bound by Judge CHOY's prior decisions not to continue this trial beyond the April, 2006 trial dates.

48. [LUCASSE's] oral request to continue the trial was properly denied by Judge ENRIGHT as there were no compelling reasons to disturb Judge CHOY's prior rulings.

Our conclusion that the family court abused its discretion in refusing to extend pretrial deadlines and in sanctioning Wife for missing the deadlines renders it unnecessary to address Wife's contention that the family court abused its discretion in failing to continue the trial date.

■ We observe, however, that the family court did not explain the basis for its statement that the case was in a position to be dismissed because it was over a year old, and we are unaware of any cogent explanation for such a statement. Additionally, insofar as the family court based its ruling on principles of law of the case and judicial deference, the supreme court has instructed that

> [l]aw of the case does not ... have the inexorable effect of *res judicata* and does not preclude the court from reconsidering an earlier ruling if the court feels that the ruling was probably erroneous and more harm would be done by adhering to the earlier rule than from the delay incident to a reconsideration and the possible change in the rule of law to be applied.

In fact, it has been noted that, so long as a trial court retains jurisdiction, it always has the power to reexamine, modify, va-

cate, correct and reverse its prior rulings and orders.

*Chun v. Bd. of Trs. of Employees' Retirement Sys. of State of Hawai'i,* 92 Hawai'i 432, 441, 992 P.2d 127, 136 (2000) (citations and internal quotation marks omitted). Furthermore, the concept of judicial deference "is not an absolute rule that prevents one judge from changing an earlier ruling once the facts are more fully developed, thus making obvious the prejudice which would result from enforcing the earlier ruling." *State v. Mabuti,* 72 Haw. 106, 114, 807 P.2d 1264, 1269 (1991); *see also State v. Oughterson,* 99 Hawai'i 244, 254, 54 P.3d 415, 425 (2002) ("[A] change in the factual underpinning [sic] a particular ruling may rise to the level of a 'cogent reason' that would justify a court in overturning the ruling of another court of equal and concurrent jurisdiction."); *Tradewinds Hotel, Inc. v. Cochran,* 8 Haw.App. 256, 264, 799 P.2d 60, 66 (1990) ("A judge may also modify a prior order of a fellow judge on a multiple judge court where exceptional circumstances are presented.").

### G. Whether the Family Court Incorrectly Valued Husband's Law Practice

Our conclusion that the family court abused its discretion when it failed to extend pretrial deadlines renders it unnecessary to address Wife's remaining issues on appeal. However, for the guidance of the family court on remand, we address Wife's contention that the family court incorrectly valued Husband's law practice in dividing the marital estate.

The family court entered the following FsOF with respect to the value of Husband's law practice:

191. [Candon] was a certified business appraiser who determined the fair market value of [Husband's] law practice as of December 31, 1997 and as of December 31, 2005.

192. [Candon] was an expert in the areas of accounting, business valuation, business appraisals, and tax.

193. [Candon] properly used the asset based approach in his two (2) valuations because under *Antolik v. Harvey,* 7 Haw. App. 313[, 761 P.2d 305] (1988), a business

has no marketable goodwill if the business does not have an enforceable right to prevent the professional from quitting and competing with it, if the future profitability of the business depends predominantly on the owner's skill, reputation, and effort, if the business has no enforceable legal right to prevent the professional from decreasing his efforts on behalf of the business, and if the business has no enforceable legal right to compel its clients to stay with the business when the owner leaves.

194. Since [Husband] was the only attorney at his law firm and there was no agreement compelling him to stay at his law firm, *Antolik v. Harvey* was the controlling authority here.

195. [Candon] properly excluded [Husband's] personal goodwill from the value of his law firm.

196. [Candon] also properly applied discounts to his valuations due to the lack of marketability of [Husband's] law firm.

197. [Candon] did not assign a value to [Husband's] pending cases because of the nature of personal injury cases. Since these cases are taken on a contingency fee basis, unless they are actually settled or resolved cases, their value is speculative.

198. It was appropriate for [Candon] to use December 31, 1997 as the valuation date to determine the [FMV] of [Husband's] law firm on the date of marriage (December 25, 1997).

199. Expert reports in this case were due to be exchanged and submitted to the Court on January 20, 2006 pursuant to Pretrial Order No. 1. Therefore, it was appropriate for [Candon] to use December 31, 2005 as the valuation date to determine the [FMV] of [Husband's] law firm at the end of this marriage.

200. [Wife] did not call any expert witnesses or submit any expert reports to contradict [Candon's] testimony and his reports.

201. [Candon's] testimony and reports were credible and trustworthy.

202. [Candon] determined that the [FMV] of [Husband's] law practice as of the date of marriage, December 31, 1997,

was *$293,000.00*. Therefore, the Category 1 value of this asset was *$293,000.00*.

203. [Candon] determined that the [FMV] of [Husband's] law practice as of December 31, 2005 was *$347,000.00*. Therefore, the Category 2 value of this asset was *$54,000.00*.

Wife urges this court to vacate the family court's FsOF with regard to Husband's law practice and contingency-fee cases and remand for reconsideration. Wife also requests that we reexamine and clarify our holding in *Antolik v. Harvey*, 7 Haw.App. 313, 761 P.2d 305 (1988), which Wife claims "has resulted in the gross undervaluation of countless successful businesses in Hawaii divorce cases simply because their fortunate owner happened to be 'a professional[']."

In *Antolik*, the family court valued the husband's sole proprietorship chiropractor business, Kalaheo Chiropractic, at $8,000.00 as of the date of marriage (DOM) and $48,000.00 as of the date of final separation in contemplation of divorce (DOFSICOD), and ordered the husband to pay the wife one-half of the $40,000.00 increase in the business's value from DOM to DOFSICOD. *Antolik*, 7 Haw.App. at 314–15, 761 P.2d at 307. On appeal, the wife contended that the family court's $48,000.00 value of the husband's business as of DOFSICOD was clearly erroneous because the amount did not include the value of "goodwill." *Id.* at 316, 761 P.2d at 308. Disagreeing with the wife, this court initially explained:

> Goodwill is an attribute of a business. An "income-producing entity, regardless of the nature of the business organization, may have an asset of recognized value beyond the tangible assets of such entity, an intangible asset generally characterized as goodwill." "[G]oodwill is a marketable and transferable asset."
>
> ... [T]here are three judicial views on the question whether the goodwill of the business of a professional that is accumulated during the marriage is marital property. First, the majority view is that such goodwill is a business asset with a determinable value and is marital property. Second, some courts have held that such goodwill is not property and thus cannot

be marital property. The third view distinguishes between true goodwill which is a marketable business asset and the goodwill which is dependent on the continued presence of the professional involved. The former constitutes marital property, while the latter does not. The distinction is explained by the Nebraska Supreme Court as follows:

> [W]here goodwill is a marketable business asset distinct from the personal reputation of a particular individual, as is usually the case with many commercial enterprises, that goodwill has an immediately discernible value as an asset of the business and may be identified as an amount reflected in a sale or transfer of such business. On the other hand, if goodwill depends on the continued presence of a particular individual, such goodwill, by definition, is not a marketable asset distinct from the individual. Any value which attaches to the entity solely as a result of personal goodwill represents nothing more than probable future earning capacity, which, although relevant in determining alimony, is not a proper consideration in dividing marital property in a dissolution proceeding.

*Taylor v. Taylor*, 222 Neb. [721,] 731, 386 N.W.2d [851,] 858 [ (1986) ].

We generally agree with the Maryland court that it is essential to recognize "the difference between true goodwill and an individual's reputation, which may be characterized as the ability to obtain future earnings masquerading as goodwill." *Prhahinski[Prahinski]*, 75 Md.App. [113] at 133, 540 A.2d [833] at 843 [1988]. Therefore, we adopt the third view espoused by the courts of Arkansas; Maryland; and Nebraska with two reservations: 1) we question whether the word "reputation" adequately describes what must be excluded to arrive at the true goodwill of the business and 2) we question whether the third view adequately provides for situations where the business has the enforceable legal right to the individual's continued services or to prevent the individual from quitting and competing with it.

Whether the intangible assets of the business of a professional constitute true goodwill or not should be determined by the trier of fact on a case-by-case basis.

. . . .

When dividing and distributing the value of the property of the parties in a divorce case, the relevant value is, as a general rule, the [FMV] of the parties' interest therein on the relevant date. We define the FMV as being the amount at which an item would change hands from a willing seller to a willing buyer, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts.

We disagree with the position advanced by Wife, . . . that the relevant value of a sole professional business is its value to the professional who operates it. Other assets are, as a general rule, valued at their FMV. We know of no valid reason why sole professional businesses should not be valued at their FMVs.

. . . . The approaches currently used by accountants when determining the FMV of closely held businesses are divided into two categories and various subcategories as follows:

1.  Asset-based approaches
    a.  Tangible book value
    b.  Adjusted book value
    c.  Price-book value ratio
2.  Earnings-based approaches
    a.  Capitalization of earnings
    b.  Capitalization of excess earnings
    c.  Discounted cash flow

Whatever approach or combination of approaches is used to support an amount, it must always be remembered that (1) in divorce cases the sole object of the exercise is to determine the FMV of the business on the relevant date and (2) absent special circumstances, the value of a sole proprietorship professional business does not include, and must be separated from, the value attributable to the sole professional who operates it.

*Antolik,* 7 Haw.App. at 317–19, 761 P.2d at 308–09 (some citations omitted).

Wife claims that (1) "the bright line rule excluding any consideration of professional goodwill in *Antolik*" is inconsistent with *Gussin v. Gussin,* 73 Haw. 470, 836 P.2d 484 (1992), which struck down uniform starting points as undeniably restricting the exercise of the family court's wide discretion, and repugnant to HRS § 580–47 (Supp.1990); and (2) *Antolik's* reliance on marketability is misplaced. Wife also argues that even under *Antolik,* "a sole professional's future earning capacity remains relevant in divorce proceedings, since it 'can be considered by the family court when . . . determining alimony." Finally, Wife contends that the family court clearly erred when it refused to consider the substantial value of Husband's unliquidated contingency fee contracts pending at DOCOEPOT in dividing the marital estate.

1.

Contrary to Wife's contention, *Antolik* did not establish a bright-line rule that restricts the family court's discretion to equitably divide and distribute a couple's property as part of a divorce. *Antolik* did not alter in any way "the discretionary power of a trial court in dividing and distributing property in a matrimonial action under HRS § 580–47[,]" nor the well-recognized principle that "the division and distribution of property pursuant to a divorce need not be equal but should be just and equitable." *See Teller v. Teller,* 99 Hawai'i 101, 107, 53 P.3d 240, 246 (2002). *Antolik* merely adopted a flexible approach for determining whether the tangible and intangible assets of a professional business constitute marital property that can be valued and divided upon divorce.

More specifically, we held in *Antolik* that the "true goodwill" of a business is a marketable business asset that can be valued and divided. *Antolik,* 7 Haw.App. at 317–18, 761 P.2d at 308–09. We also held that goodwill that is attributable to an individual's reputation is not property that can be valued and divided upon divorce but instead, "may be characterized as the ability to obtain future earnings[.]" *Id.* at 318, 761 P.2d at 309. We further observed that "[w]hether the intangible assets of the business of a professional constitute true goodwill or not should be

determined by the trier of fact on a case-by-case basis." *Id.*

Brett R. Turner, in his treatise on equitable distribution of property, discusses the importance of distinguishing between "enterprise goodwill" (which we referred to as "true goodwill" in *Antolik*) and "individual goodwill" in valuing a professional business practice:

> [T]here is broad general agreement that businesses and professional practice constitute *property* which is subject to division upon divorce. There is equally broad disagreement, however, as the [sic] conditions under which goodwill can be considered in determining value.
>
> The first step in considering the case law on goodwill is to define the subject of the debate. When marketable businesses are bought and sold upon the open market, the actual negotiated price for the conveyance is often greater than the total value of the tangible assets of the business involved. This difference is due to the fact that the income of a business depends upon many factors other than its assets. Many of these factors are transferred along with the business: for example, a convenient location, the reputation of a trade name, or even simply "the probability that the old customers will resort to the old place." Because these factors are transferable, persons who purchase a business upon the open market are often willing to pay more than the total value of the business' [sic] individual hard assets. This additional element of value is called *goodwill.*
>
> For purposes of division upon divorce, goodwill can further be divided into two different categories. This subsection considers the status of *enterprise goodwill:* goodwill which is transferred whenever the enterprise to which it attaches is bought and sold. Necessarily, enterprise goodwill exists only in businesses which can be bought and sold as an ongoing concern. The following subsection will consider the status of *individual goodwill:* goodwill which is not transferable when the enterprise is bought and sold, and which instead resides primarily in the personal reputation of the owners.
>
> *The strong general rule is that enterprise goodwill must be included when valuing a business entity. The underlying reasoning is the same as the reasoning for treating businesses and professional practices as marital property: enterprise goodwill is transferable for real dollars on the open market.*
>
> Enterprise goodwill is property even where the underlying business has limited marketability. Transferable value for purposes of divorce does not mean immediate liquidation value. Normally, transferable value assumes a willing buyer and a willing seller, with neither party under any particular compulsion to act immediately. By refusing to assume a compelled sale, the law necessarily rejects a short-term definition of marketability. Transferable value is essentially value at a sale in the due course of business, even if the due course of business might require some expenditure of time and effort in order to find a suitable buyer. The difficulty and expense of marketing the business is a relevant factor to be considered in determining value, . . . but it is not a sufficient reason to hold that no value is present.
>
> A number of decisions purport to hold that goodwill in general is not a valid element of value, without expressly distinguishing between enterprise goodwill and individual goodwill. These decisions need to be reviewed carefully, for the goodwill at issue on the facts has almost always been individual goodwill. A number of states have begun their consideration of the goodwill issue with this sort of broad holding, and have then qualified the broad holding to apply only to individual goodwill. Based upon this history, there is a reasonable likelihood that other decisions purporting to hold that goodwill is never marital property, when the facts of the case involved individual goodwill, will likewise be qualified. Such qualification is good policy, as there is no reason not to treat goodwill as property when it can be realized through sale upon the open market.

. . . .

In states which treat only enterprise goodwill as a valid element of value, and which refuse to treat individual goodwill in the same manner, it is obviously extremely important to distinguish between enterprise and individual goodwill.

The key distinction in practice appears to be whether the goodwill at issue can be transferred as part of a sale on the open market. If the goodwill can be so transferred, it does not seem materially different from any open business asset with an actual [FMV]. If the goodwill cannot be so transferred, and it exists only so long as the business is in the hands of the present owner, the goodwill lies in the owner and not the enterprise, and it is therefore individual goodwill.

There is no requirement that goodwill lie entirely in the enterprise or entirely in the individual owner. It is entirely possible, for example, that a business might derive additional earnings from both a convenient location and the individual reputation of the owner. A good example might be a dental practice, conveniently located near several large office buildings, which draws some of its clients from its location, but draws other clients from the dentist's own personal reputation. If this practice were to be transferred to another dentist, it would retain those earnings attributable to its location, but it would obviously not retain those earnings attributable to the former owner. Thus, it is very possible that enterprise goodwill and individual goodwill can exist in the same business.

Brett R. Turner, 2 *Equitable Distribution of Property* § 6:73, at 395–400 (3d ed.2005) (emphasis added; citations and footnotes omitted).

In summary,

[t]he goodwill of a business entity is the difference between the ongoing concern value of the enterprise and the total value of its tangible hard assets . . . . [G]oodwill consists of enterprise goodwill, which belongs to the business itself, and individual goodwill, which belongs to the owning spouse individually. Enterprise goodwill is essentially transferable goodwill: goodwill

which will continue to exist even after the business is transferred to a new owner. Individual goodwill follows the owner, and cannot be transferred when the business is sold. Because enterprise goodwill can be transferred for consideration, it is always considered when determining the value of a business for purposes of equitable distribution.

*Id.* § 6:74, at 406 (footnote omitted).

### 2.

■ In *Antolik*, we noted that goodwill that depends on the continued presence of a particular individual is not a marketable asset but "represents nothing more than probable future earning capacity, which, although relevant in determining alimony, is not a proper consideration in dividing marital property in a dissolution proceeding." *Antolik*, 7 Haw.App. at 318, 761 P.2d at 309 (quoting *Taylor*, 386 N.W.2d at 858).

Wife maintains that "most courts use an earnings-based approach, including the value of the professional's goodwill," and "the *Antolik* Court adopted what it conceded was a minority view[.]" Wife, therefore, urges us to abandon the *Antolik* minority approach.

We decline Wife's invitation to do so and observe that the *Antolik* approach is now the nationwide majority:

Case law on treatment of individual goodwill in divorce cases is divided. One line of cases holds that all forms of goodwill must be included in determining the value of the business for purposes of equitable distribution. A second line of cases holds that individual goodwill cannot be so included. In 1993, when the second edition of this treatise was written, the two lines of cases were of equal size. In 2004, when the present section was written, the second line of cases is the majority rule.

2 *Equitable Distribution of Property* § 6:74, at 406–09 (footnotes omitted).

### 3.

Wife contends that in evaluating Husband's law practice for equitable distribution purposes, the family court erred in failing to consider (1) the more than $1 million dollars

in contingency fees that Husband received after Husband's law business was appraised by Candon as of December 31, 2005, which was essentially the DOFSICOD; and (2) the value of Husband's unliquidated contingency fee contracts pending at DOCOEPOT. We agree.

*a.*

It is well-accepted that hourly-fee contracts for attorney services constitute divisible marital property:

> Amount [sic] due under a traditional hourly-basis fee contract for work performed during the marriage are always marital property. Like any other receivable, they should be discounted by expenses of collection and a reasonable bad debt percentage.

1 *Equitable Distribution of Property* § 5:22, at 372–73 (footnotes omitted). Similarly, when a client recovers a settlement or verdict before trial of an attorney's divorce case, the attorney's share of the recovery pursuant to a contingency-fee contract is "universally" regarded as "marital property to the extent that the attorney's work on the case occurred during the marriage. Thus, if half of the time spent on a contingent fee case is spent during the marriage, half of the fee is marital property." *Id.* § 5:22, at 373 (footnotes omitted).

The classification of contingent fees that are potentially due on cases that remain pending at DOCOEPOT has proved far more problematic:

> Under [contingency-fee] contracts, the attorney's fee is a specified percentage of the client's ultimate recovery. If the client does not recover, then the attorney gets no fee, although most contingent contracts specify that the client is responsible for the attorney's out-of-pocket expenses regardless of whether the case is won or lost. When an attorney with unliquidated contingent fee contracts divorces his or her spouse, the court must determine whether these contracts will be considered marital property subject to distribution. The difficulty in classifying such contracts arises precisely because of their contingent nature, which makes it impossible for the

court to place an accurate value on them at the time of distribution. There is no way to predict with any certainty whether the client will recover and, if so, in what amount that recovery may be.

Charles W. Davis, Annotation, *Divorce and Separation: Attorney's Contingent Fee Contracts as Marital Property Subject to Distribution,* 44 A.L.R.5th 671 (1996).

In some jurisdictions, a contingent-fee contract is not classified as divisible marital property if no recovery has been obtained as of the date of an attorney's divorce trial.

In *Goldstein v. Goldstein,* 262 Ga. 136, 414 S.E.2d 474, 475–76 (1992), for example, the court concluded:

> We agree with husband that contingent fee agreements are not marital assets.... [I]t is impossible to know in advance whether any specific contingent fee case will ultimately yield a fee—or, if it does, how much the fee will be. It is also nearly impossible to gauge how much work and expense will be required after the date of the divorce to become entitled to collect a contingent fee. These qualities of contingent fee agreements make them too remote, speculative and uncertain to be considered marital assets in making an equitable division of property.

In *Beasley v. Beasley,* 359 Pa.Super. 20, 518 A.2d 545, 554 (1986), the Pennsylvania Superior Court observed that "[i]t is tenuous and risky to attempt to evaluate the likely return on contingent fees and as such, no value can be placed on them for purposes of equitable distribution." However, the court also stated that the appellant's inventory of contingent-fee cases could be considered in determining the appellant's earning capacity for purposes of awarding alimony. *Id.* at 554–55.

In *In re Marriage of Zells,* 143 Ill.2d 251, 157 Ill.Dec. 480, 572 N.E.2d 944, 945 (1991), the Illinois Supreme Court affirmed the appellate court's conclusion that contingent fees are not marital assets because of their contingent, speculative, and intangible nature. The Illinois court also noted that court-ordered division of contingent fees would violate the Illinois Rules of Professional Con-

duct, which prohibit fee-sharing between a lawyer or law firm and a non-lawyer. *Id.* Like Pennsylvania, however, the Illinois Supreme Court held that contingent-fee cases could be considered in awarding alimony. *Id. See also Musser v. Musser*, 909 P.2d 37, 40–41 (Okla.1995) (holding that pending contingency-fee cases of a law firm constitute future income and not marital assets, and although these cases may not be considered in calculating property-division alimony, they may be considered in establishing support alimony); *In re Marriage of Hershewe*, 931 S.W.2d 198, 204 (Mo.Ct.App.1996) (stating that "[o]bviously, no market value can be readily, if at all, placed upon contingency fee contracts" for "[t]hey cannot be bought and sold like other assets[,]" and holding that fees generated from contingency case files are future income, not marital property, and "what will be received is 'purely speculative' ").

The majority of courts that have considered this issue hold that unliquidated contingency-fee agreements constitute marital property and are subject to distribution upon divorce. *McDermott v. McDermott*, 336 Ark. 557, 986 S.W.2d 843 (1999); *Garrett v. Garrett*, 140 Ariz. 564, 683 P.2d 1166 (Ct.App. 1983); *In re Marriage of Kilbourne*, 232 Cal.App.3d 1518, 284 Cal.Rptr. 201 (1991); *Due v. Due*, 342 So.2d 161 (La.1977); *Stageberg v. Stageberg*, 695 N.W.2d 609 (Minn.Ct. App.2005); *Erlanger v. Erlanger*, 364 N.J.Super. 449, 836 A.2d 859 (Ch. Div.2003); *Metzner v. Metzner*, 191 W.Va. 378, 446 S.E.2d 165 (1994); *Weiss v. Weiss*, 122 Wis.2d 688, 365 N.W.2d 608 (Ct.App.1985). However, these courts have taken different approaches in valuing the agreements.

Most courts have reserved jurisdiction to equitably distribute contingency fees as received. For example, the West Virginia Supreme Court of Appeals held, in relevant part:

> Contingent and other future earned fees which an attorney might receive as compensation for cases pending at the time of a divorce should ... be considered as marital property for purposes of equitable distribution. However, only that portion of the fee that represents compensation for work done during the marriage is "marital property" as defined by our statute. Because the ultimate value of a contingent fee case remains uncertain until the case is resolved, a court must retain continuing jurisdiction over the matter in order to determine how to effectuate an equitable distribution of this property.

*Metzner*, 446 S.E.2d at 174. Similarly, the Arkansas Supreme Court has stated:

> Any difficult in valuing contingency-fee contracts may be solved by reserving jurisdiction in the trial court in order to await the outcome of the underlying actions. When the proceeds of contingency-fee agreements are actually received, the determination of the marital share in the ultimate recovery should be based upon that portion of the time devoted to the case during the marriage, as compared to the full amount of time devoted to earning the fee.

*McDermott*, 986 S.W.2d at 848.

*See also In re Marriage of Kilbourne*, 284 Cal.Rptr. at 204–05 & n. 5 (concluding that contingency-fee cases in progress but unpaid at separation are "divisible community assets[,]" and the trial court may reserve jurisdiction over these cases for division of fees received in the future); *Garrett*, 683 P.2d at 1170 (rejecting the husband's contention that the value of the community labor expended to fulfill a contingency agreement should be based upon a reasonable hourly rate because "[t]his overlooks the very nature of the contract—an all or nothing proposition. It is as unfair to require the attorney/spouse to pay the other spouse for reasonable services rendered when ultimately no fee is earned because the litigation was lost as it would be to require the non-attorney/spouse to accept a sum based upon an hourly fee when the attorney/spouse receives compensation far exceeding that amount.... In this regard, we approve of the trial court's continuing jurisdiction over this matter to monitor the value of the services."); *Weiss*, 365 N.W.2d at 613 (holding that even though it is impossible to establish a present value for contingent-fee receivables on the day of divorce, such assets should not be ignored; one method of determining the appropriate division is

"to divide the asset upon receipt of payment of the contingent fee receivables").

The Minnesota court of appeals took a slightly different approach in *Stageberg,* concluding that the trial court could either determine the value of contingent-fee agreements in a "legally and factually supportable manner, or . . . retain jurisdiction over the matter and . . . calculate and divide the marital interest in the unrecovered contingent fees when (and if) those fees are received . . . based on the pro rata amounts of time husband put into the cases before and after the valuation date[.]" *Stageberg,* 695 N.W.2d at 617.

In *Erlanger,* the New Jersey Superior Court stated the following with respect to how contingency fees should be valued:

The better practice is to set out an equitable formula that can be applied to the asset after its value becomes known. Thus, the issue presented is how to fairly distribute a speculative asset. Some courts have struggled over the practicality of retaining jurisdiction over the divorce until the contingency case is concluded. This is not only unwieldy, but bifurcation of issues is disfavored in New Jersey.

In this case it would be fair to apply the same valuation method already used in this matter by defendant's expert to apportion the fee in the case that settled after the divorce Complaint but before the divorce trial, to the remaining fees. As the expert in this case noted, in a contingency case, every hour expended must be treated as being equally important to the rest. The net counsel fee should multiply the fraction of hours spent before the divorce complaint was filed over the total number of hours spent. Plaintiff is awarded 50% of that figure, for reasons stated in the main body of this opinion. Using such a formula is no more complicated than the methods used to divide other assets by formula when the value is unknown. For example, in many cases the issue of dividing a pension through a Qualified Domestic Relations Order is accomplished without having a value placed on the pension as of the settlement date. Proceeds of closings, depending on sales prices that have not been determined and affected by as yet unknown closing costs, are routinely awarded by percentage.

Of course, the amount of a contingency fee is much more speculative. Defendant himself can only opine a wide range of value on the fee he hopes to achieve. This method is also subject to defendant's honesty and good will in reporting the total hours spent, only spending necessary and reasonable hours, and prosecuting the contingency case in a timely fashion. Parties are always expected to act with integrity in following an Order of the court.

A post-judgment motion can raise any valid concerns held by plaintiff about defendant's adherence to the formula. To facilitate the execution of this Order, . . . [d]efendant is to prepare an affidavit of hours and expenses incurred to date and serve it upon plaintiff within sixty days. He is to update it every sixty days thereafter until the contingency case is concluded and the fee disbursed. He is to give plaintiff thirty days' notice of any intent to disburse any part of the counsel fee, to give her an opportunity to object, via a motion.

*Erlanger,* 836 A.2d at 860–61 (citations omitted).

In summary then, courts that hold that contingency-fee agreements are not marital property generally base their decisions on the difficulty of valuing these agreements, concerns about breaching the attorney-client privilege if access to confidential client files is necessary to ascertain the value of contingency-fee cases, and ethical prohibitions against fee-splitting between lawyers and non-lawyers. Generally, however, these courts allow the use of the contingency-fee agreements to evaluate the future earning capacity of the attorney spouse for purposes of calculating alimony. Courts that hold that contingency-fee contracts are marital property generally reserve jurisdiction to divide contingency fees as they are received or establish a formula for dividing the fees when received.

*b.*

In this case, the family court did not consider Husband's unliquidated contingency-fee

cases that were pending at DOFSICOD and DOCOEPOT as either divisible marital property or evidence of future earning capacity for purposes of determining spousal support. We conclude that the family court erred.

Husband's expert, Candon, testified that his cut-off date for valuing Husband's law practice was the "most practical date," December 31, 2005, which we observe was a few days after the parties had separated, i.e., the DOFSICOD. Candon acknowledged that he was not told about three cases that settled in early 2006 and netted Husband $1.1 million in contingency fees. Candon also opined that it would be improper to value Husband's unliquidated contingency-fee cases that were pending at DOCOEPOT because whether and how much Husband would receive was speculative.

▅▅▅ In dividing the marital estate of the parties, the family court ignored the $1.1 million that Husband received in January 2006 and the unliquidated contingency-fee cases that were pending at DOCOEPOT. The family court also did not consider the value of these cases in determining whether it was just and equitable to order Husband to provide for Wife's future support and maintenance. We must decide, as a matter of first impression, therefore, whether Husband's contingency-fee cases constituted marital property that was subject to equitable distribution by the family court. We now join the majority of jurisdictions that hold that an attorney spouse's contingency-fee cases are marital property subject to division.

c.

▅▅▅ The $1.1 million that Husband received in January 2006, post-DOFSICOD, clearly was marital property that was subject to division. *See Jackson v. Jackson,* 84 Hawaiʻi 319, 335, 933 P.2d 1353, 1369 (App.1997) (stating that "the marital partnership continues until the DOCOEPOT").

▅▅▅ The more problematic issue is how Husband's unliquidated contingency-fee cases pending at DOCOEPOT should be valued for property-division purposes.

As discussed above, in most jurisdictions that treat pending contingency-fee cases as marital property, trial courts retain jurisdiction over the divorce case in order to effectuate an equitable distribution of contingency fees as the fees are received. However, this is not an option in Hawaiʻi because in *Boulton v. Boulton,* 69 Haw. 1, 4, 730 P.2d 338, 339 (1986), the Hawaiʻi Supreme Court construed HRS § 580–56(d) (1976) [19] as divesting the family court of jurisdiction to make a property division "following ... the elapse of one year after entry of a decree or order reserving the final division of property of the party[.]" (Brackets omitted.) Therefore, the family court would lose jurisdiction to distribute contingency fees received more than a year after entry of a decree or order reserving the final division of the property, and an attorney spouse could avoid sharing these fees with a non-attorney spouse merely by delaying litigation or settlement of contingency-fee cases until after the one-year period had expired.

In New Jersey, where bifurcation of issues is disfavored as unwieldy and impractical, the attorney spouse is required to keep track of hours and expenses incurred on contingency-fee cases during the marriage and after the divorce so that a fractional apportionment can be made of the contingency fees earned during the marriage, much in the way pensions are divided through a qualified domestic relations order. *Erlanger,* 836 A.2d at 860–61. However, the New Jersey approach essentially converts the contingency-fee contract into an hourly fee contract, which is inconsistent with the all-or-nothing premise underlying a contingency-fee contract.

In *Antolik,* this court noted that accountants generally use either an asset- or earn-

19. HRS § 580–56(d) provided, as it does today, as follows:

Following the entry of a decree of divorce, or the entry of a decree or order finally dividing the property of the parties to a matrimonial action if the same is reserved in the decree of divorce, or the elapse of one year after entry of

a decree or order reserving the final division of property of the party, a divorced spouse shall not be entitled to dower or curtesy in the former spouse's real estate, or any part thereof, nor to any share of the former spouse's personal estate.

ings-based approach in valuing a closely held business. *Antolik*, 7 Haw.App. at 319, 761 P.2d at 309. One treatise on valuation of assets describes in practical terms the cost- or asset-based approach to evaluating a law firm's present value:

> This [approach] involves identification, analysis, and valuation of the entity's various assets and liabilities. Often an adjusted balance sheet will be compiled, so that each component can be adjusted to [FMV] and unrecorded assets and liabilities can be taken into consideration.

Many law firms have little in terms of "bricks and mortar," as they may lease their office space and certain office equipment. Therefore, the most significant tangible assets of a law firm are often accounts receivable and work in process; as discussed previously, these must be added to a law firm's balance sheet, if not already recorded.

### [1]  Accounts Receivable

A law firm will most likely maintain records as to receivables when it bills its clients on an hourly basis for its services. Some smaller law firms may not maintain schedules or agings of receivables; in this case, the appraiser may consider compiling this data from underlying documents such as client files.

If the appraiser is provided with gross receivables (*i.e.*, as billed), then the appraiser should consider an allowance for uncollectible accounts, which can be based on discussions with the practice's accountant or controller. The degree of write-offs may vary by field of specialty. For example, family law attorneys may have higher write-offs than bankruptcy attorneys, which may be paid up-front for their work. Altman Weil publishes some survey statistics on realization and write-offs by region, size of firm, etc., and for selected practice areas.

The appraiser should also add a deferred tax liability for the receivables to offset the tax impact of future cash receipts. Other accrual assets/liabilities should be treated in a similar manner.

### [2]  Work in Process (WIP)

This asset relates to work performed by the firm but not yet billed, and is especially prevalent in contingency matters. If the law firm bills its clients on an hourly basis as services are provided, then it is often relatively simple to compile or estimate WIP. The appraiser would first determine how often bills are sent to the firm's clients, then ascertain when the bills were last prepared before the valuation date. This will determine the period for which services have not been billed; it may only be a matter of a few weeks.

At that point, the appraiser would request information of the number of unbilled hours and the hourly rates of each professional, plus any unbilled expenses. If the firm has a computerized billing system in place, this may be provided in summary format to the appraiser. However, most firms do not bill 100 percent of the unbilled time based on historical experience. Once the work in process is calculated, an additional adjustment is probably necessary to reduce WIP for estimated uncollectibles. Again, this adjustment should be based on historical experience and this information can often be obtained from the firm's bookkeeper, accountant, or principals.

In some cases, the firm may work on a contingency basis and as such, WIP is usually more difficult to estimate for these firms. The appraiser may need to estimate this asset through a review of client billing files. One way to analyze WIP for a firm with contingency cases is through the following steps:

- Identify the outstanding cases at the valuation date (A).
- Estimate the average fee per case, net of direct expenses (B).
- Assess the success rate or "batting average" of the firm (C).
- Determine or estimate the percentage overhead per case (D).
- Multiply the number of open cases (A) by the net average fee per case (B) by the batting average (C) less the percentage overhead (D) to obtain the estimated future profit attributable to the WIP (E).

• Estimate the average length of time that the firm's cases are open (F). This could be accomplished by comparing a case's start date to its award date for a number of cases, if the data is available.

• Calculate the estimated date of completion for each case (G) by comparing its start date to the average length of case (F).

• Select an appropriate discount rate to apply to the present value calculations (H).

• Determine the present value of the WIP by discounting the estimated future profit (E) by the discount rate (H) using as a time factor the estimated completion date per case (F).

.... After this analysis is completed, the value of the WIP is added to the firm's adjusted balance sheet.

**[3] Other Adjustments**

Other types of adjustments may include, but are not limited to, the following:

• Adjustment of cash and investments (operating and, if applicable, nonoperating to [FMV])

• Recognition of prepaid expenses (*e.g.*, malpractice insurance)

• Adjustment of fixed assets (to estimated [FMV])

• Recognition of accounts payable (may be minimal if cash basis taxpayer)

• Recognition of unearned retainer fees....

The appraiser may identify relevant adjustments through discussions with management or the firm's accountant.

*Valuing Specific Assets in Divorce* § 11.04, at 11–16 to 11–19 (Robert D. Feder et al. eds., 2008).

On remand, the family court may use the foregoing methodology in valuing Husband's unliquidated contingency-fee cases that were pending at DOCOEPOT. In the alternative, if Husband has received contingency fees for those cases that were pending at DOCOEPOT, the family court may divide Husband's net receivables by using a fractional apportionment based on the time Husband put into the case during the marriage and the total amount of time Husband expended to effectuate a recovery.

**CONCLUSION**

In light of the foregoing discussion, we (1) affirm the "Order Denying [Wife's] Motion to Enforce [AITD]" entered on November 28, 2005; (2) reverse the "Order Denying [Wife's] Motion to Extend Pre–Trial Deadlines" entered on April 7, 2006; (3) affirm that part of the May 18, 2006 Divorce Decree that granted a divorce to Husband but vacate those parts of the Divorce Decree that denied Wife alimony and divided Husband and Wife's marital property; (4) reverse the "Order Denying Without Hearing [Wife's] May 31, 2006 Motion for Reconsideration of Divorce Decree Filed May 18, 2006 and for New Trial" entered on July 17, 2006; and (5) vacate the [FsOF/CsOL] filed on August 16, 2006.

We remand for further proceedings consistent with this opinion.